In re Cecil Allen WATKINS and Debra Tabla Watkins, Debtors.

Kenneth A. Manning, Plaintiff,

v.

Cecil Allen Watkins and Debra Tabla Watkins, Defendants.

Bankruptcy No. 09–21095 JPK.
Adversary No. 10–2042.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

July 6, 2012.

629

Kenneth A. Manning, Dyer, IN, pro se.

*MEMORANDUM OF DECISION
CONCERNING ACTION TO
DENY DISCHARGE*

J. PHILIP KLINGEBERGER,
Bankruptcy Judge.

This adversary proceeding was initiated by the plaintiff Kenneth A. Manning, as Trustee of the Chapter 7 bankruptcy es-

tate of Cecil Allen Watkins and Debra Tabla Watkins [case number 09–21095] ("Trustee") by a complaint filed on March 30, 2010 to seek to deny discharge to the debtors/defendants (respectively, "Allen" and "Debra"). The Trustee has narrowed his assertions down to the provisions of 11 U.S.C. § 727(a)(2)(A), 11 U.S.C. § 727(a)(2)(B), 11 U.S.C. § 727(a)(4)(A) and 11 U.S.C. § 727(a)(5). The court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and (b)(1), and N.D.Ind. L.R. 200–1(a). This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

The record by which the case will be determined was made by evidence presented at the trial held on two separate days—October 6, 2011 and October 28, 2011—and by the closing arguments presented at a hearing held on November 29, 2011.

■ At the outset it's worthwhile to note principles which generally apply to an action to deny a debtor's discharge. As this court stated in *In re Tauber*, 349 B.R. 540, 545–546 (Bankr.N.D.Ind.2006):

> The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor. As the Seventh Circuit Court of Appeals has stated:
>
>> The purpose of the Code is to provide equitable distribution of the debtor's assets to the creditors and "to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. United States Fid. & Guar. Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915). We construe the Bankruptcy Code "liberally in favor of the debtor and strictly against the creditor." *Gul-*

*lickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir.1997); *In re Reines*, 142 F.3d 970, 973 (7th Cir. 1998); *In re Adlman*, 541 F.2d 999, 1003 (2d Cir.1976); 11 U.S.C. § 727(a) (providing that, "the court shall grant the debtor a discharge, unless . . .").

Thus, consistent with the Code, bankruptcy protection and discharge may be denied to a debtor who was less than honest. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ("But in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' ") (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)); *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995) ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment."). If a creditor demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor, the court can deny the discharge. *See Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir.2000); *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966–67 (7th Cir.1999); *cf. Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755. The intent to defraud must be actual and cannot be constructive; however, because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence. *See In the Matter of Krehl*, 86 F.3d 737, 743–44 (7th Cir.1996); *Smiley v. First Nat'l Bank of Belle-*

*ville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir.1989).

*Village of San Jose v. McWilliams*, 284 F.3d 785, 789–790 (7th Cir.2002).

This Court does not take lightly a creditor's, or for that matter a Trustee's, request for the outright denial of a discharge. In fact, it is within the discretion of a bankruptcy court to grant a discharge even when grounds exist for the denial of a discharge. *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir.2002) (*citing, In re Hacker*, 90 B.R. 994, 997 (Bankr. W.D.Mo.1987)). But, although a denial of a discharge "should be construed liberally in favor of a debtor," a discharge is a privilege and not a right; *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996).

In the context of an adversary proceeding in which denial of discharge was asserted under 11 U.S.C. § 727(a)(2) and (a)(4), the following was stated in *In re Rule*, 2011 WL 841505 (Bankr.E.D.Ky.2011):

A bankruptcy discharge is grounded upon the public policy of freeing the honest, but unfortunate, debtor from the financial burdens of prepetition debts. *See e.g., Williams v. United States Fidelity & Guar., Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Denial of a discharge is a harsh outcome; therefore the requirements of 11 U.S.C. § 727(a) are precise, encompassing only those individual debtors who are not honest and forthcoming about their assets and financial affairs. *See, e.g., Buckeye Retirement Properties v. Tauber (In re Tauber)*, 349 B.R. 540, 545 (Bankr.N.D.Ind.2006) ("The denial of a debtor's discharge is akin to financial capital punishment. It is reserved for the most egregious misconduct by a debtor.").

Indeed, the denial of a general discharge can work a serious deprivation upon a debtor, and there are many circumstances where a debtor's acts and omissions may have been inadvertent or otherwise excusable. Thus, the provisions of § 727(a) are to be construed liberally in favor of granting debtors the fresh financial start contemplated by the Bankruptcy Code and the Supreme Court, and construed strictly against parties seeking to deny the granting of a debtor's discharge. *See, among others, Meyers v. Internal Revenue Service (In re Meyers)*, 196 F.3d 622, 624 (6th Cir. 1999) (quoting *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). As the party seeking the denial of the debtors' general discharges, the United States trustee, as plaintiff, bears the burden of proving that the debtors are not entitled to discharges under § 727(a). *See* Fed. R. Bankr.P. 4005. The standard of proof for allegations under § 727(a) is by a preponderance of the evidence. *See Grogan*, 498 U.S. at 286–87, 111 S.Ct. 654.

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 901 (Bankr.W.D.Tenn.2009).

To find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud. *In re Puente*, 49 B.R. at 969. The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that the debtor acted so recklessly in not reporting the asset that fraud is implied. 4 Collier on Bankruptcy ¶ 727.15[4] (1992).

*Matter of Yonikus*, 974 F.2d 901, 905 (7th Cir.1992).

The grounds for denial of discharge under any provision of 11 U.S.C. § 727(a) must be established by a preponderance of the evidence: *In re Scott,* 172 F.3d 959, 966–67 (7th Cir.1999). "Denying a chapter 7 debtor his discharge is an extraordinary remedy that is only available when the objecting party supports its claim with evidence that meets the elements of a strictly-construed statute", *In re Weddington,* 457 B.R. 102, 110 (Bankr.D.Kansas 2011).

■■ The Trustee advances his contentions concerning denial of discharge first under 11 U.S.C. § 727(a)(2), which states:

a) The court shall grant the debtor a discharge, unless—

. . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

The elements of establishing a case under the foregoing provision were stated as follows in *In re Kontrick,* 295 F.3d 724, 736 (7th Cir.2002) (Rehearing En Banc denied August 27, 2002):

The bankruptcy court granted summary judgment on Count I of Dr. Ryan's complaint, which alleged that discharge should be denied because Dr. Kontrick had violated 11 U.S.C. § 727(a)(2)(A). Section 727(a)(2)(A) provides, in relevant part, that "the court shall grant the debtor a discharge unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A). To prevail, Dr. Ryan must prove that (1) the debtor, Dr. Kontrick, (2) transferred (3) the debtor's property, (4) with the intent to hinder, delay, or defraud a creditor (5) within one year of bankruptcy. *See id.* The exception to discharge in § 727(a)(2)(A) essentially "consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993). "The party seeking to bar discharge must prove that *both* these components were present during the one year before bankruptcy; anything occurring before that one year period is forgiven." *Id.* (emphasis in original). In bankruptcy, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985).

An essentially similar formulation of the applicable standards was stated in *In re Agnew,* 818 F.2d 1284, 1287 (7th Cir.1987):

To succeed in its objection section 727(a)(2), a creditor must prove:

(1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition;

(2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

(3) that the act was that of the debtor or his duly authorized agent;

(4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

4 *Collier on Bankruptcy,* para. 727.02[1][b] (15th ed. 1986) (citing *In re*

*Kessler,* 51 B.R.895, 898 (Bankr.D.Kan. 1985)). The intent to defraud must have been actual rather than constructive. *Id.,* para. 727.02[3].

*Agnew* also discussed the concept of materiality under § 727(a)(2), stating:

> In order to justify the refusal of discharge under a section 727(a)(2) transfer, "it must be shown that there was an actual transfer of valuable property belonging to the debtor which reduced the assets available to creditor and which was made with fraudulent intent." 4 *Collier on Bankruptcy, supra,* para. 727.02[5], at 727–21 to –22.[FN1] This is consistent with a case relied upon by the district court below, which holds that a transfer may be found to be a fraudulent conveyance only if it reduces the assets that are actually available to a creditor.

FN1. There are a number of cases involving similar fact patterns holding such a conveyance to have been a transfer with fraudulent intent. *E.g., In re Parameswaran,* 50 B.R. 780 (Bankr.S.D.N.Y.1985). These cases, however, appear to involve the law of states in which one co-tenant's interest in entirety property is not immune from levy by a creditor of one spouse alone. There, a conveyance would reduce assets that are actually available to a creditor, and in such circumstances, the "badges of fraud" alleged here by Lee Supply would possibly be relevant.

*Agnew,* 818 F.2d at 1289.

As stated in *In re Scott,* 172 F.3d 959, 967–968 (7th Cir.1999):

> "Concealment ... includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *United States v. Turner,* 725 F.2d 1154, 1157 (8th Cir.1984). Cf. Black's Law Dictionary 289 (6th ed. 1990) (concealment means the "withholding of something which one knows and which one, in duty, is bound to reveal...").

. . .

(W)e have previously held that a concealment or transfer under § 727(a)(2) may occur even if no creditors are harmed by it. "Proof of harm is not a required element of a cause of action under Section 727." *Smiley,* 864 F.2d [562] at 569 (7th Cir.1989); *see also In re Snyder,* 152 F.3d 596, 601 (7th Cir. 1998). Disclosure statements are for the purpose of disclosure; the intentional withholding of relevant information is not sanctioned by the Bankruptcy Code.

The concept of "intent to defraud"—and in parallel therefor the concept of "intent to hinder" and "intent to delay"—was addressed as follows in *In re Chavin,* 150 F.3d 726, 728 (7th Cir.1998):

> Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression. E.g., *Athey Products Co. v. Harris Bank Roselle,* 89 F.3d 430, 434 (7th Cir.1996); *Marcus v. AT&T Corp.,* 138 F.3d 46, 63 (2d Cir.1998); *Restatement (Second) of Torts* § 526 (1965). Chavin concedes as he must that not caring whether some representation is true or false—the state of mind known as "reckless disregard"—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material. *In re Yonikus,* 974 F.2d 901, 905 (7th Cir.1992); *In re Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992); *In re Tully,* 818 F.2d 106, 111 (1st Cir.1987). Still, not caring is a state of mind too, and so might not be thought amenable to conclusive proof or disproof and so never determinable without a trial.

The manner of determination of intent under § 727(a)(2) was addressed in *In re Krehl,* 86 F.3d 737, 743–744 (7th Cir.1996)

(Rehearing and Suggestion for Rehearing En Banc denied August 1, 1996):

> Before a debtor may be denied a discharge under section 727(a)(2), he must be found to have acted with the actual intent to defraud, hinder, or delay creditors. *In re Smiley,* 864 F.2d at 566; see also *In re Wines,* 997 F.2d 852, 856 (11th Cir.1993). Because direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct. *In re Smiley,* 864 F.2d at 566; *see also In re Devers,* 759 F.2d 751, 753 (9th Cir.1985). The intent determination often will depend upon a bankruptcy court's assessment of the debtor's credibility, making deference to the court's finding particularly appropriate. *In re Burgess,* 955 F.2d 134, 137 (1st Cir.1992); *see also In re Bonnett,* 895 F.2d 1155, 1157 (7th Cir.1989). Thus, where the evidence on the intent question is such that two permissible conclusions may rationally be drawn, the bankruptcy court's choice between them will not be viewed as clearly erroneous. *In re Bonnett,* 895 F.2d at 1157.

The evidence below amply supports the bankruptcy court's finding that Krehl acted with the actual intent to hinder, delay, or defraud RTI's creditors. Although Krehl offered explanations at trial for each of his objectionable acts, his testimony was flatly contradicted by other witnesses in the case. In finding that Krehl acted with the actual intent to hinder, delay, or defraud the corporation's creditors, the bankruptcy court found Krehl's testimony incredible to the extent it was contradicted by that of any other witness. Krehl's demeanor on the stand, according to the court, was that of "a person who was not being fully forthcoming and truthful." (Dec. 9, 1994 Tr. at 88.) Krehl has provided us with no basis for doubting the bankruptcy court's assessment of his credibility, and thus no basis for disturbing that court's finding on Krehl's intent. *See, e.g., In re Adams,* 31 F.3d at 394.FN4

FN4 Krehl also argues that a denial of discharge was unwarranted because his conduct did not actually harm the interests of RTI's creditors. Yet so long as the debtor acted with the requisite intent under section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm. *In re Smiley,* 864 F.2d at 569; *see also In re Adeeb,* 787 F.2d 1339, 1343 (9th Cir.1986).

■ The Trustee also asserts 11 U.S.C. § 727(a)(4)(A) which states:

> (4) the debtor knowingly and fraudulently, in or in connection with the case—

> (A) made a false oath or account;

An excellent discussion of the legal principles applicable to this provision was written by the Honorable John H. Squires in the case of *In re Yonkers,* 219 B.R. 227, 231–234 (Bankr.N.D.Ill.1997):

> The discharge provided by the Bankruptcy Code is to effectuate the "fresh start" goal of bankruptcy relief. In exchange for that fresh start, the Bankruptcy Code requires debtors to accurately and truthfully present themselves before the Court. A discharge is only for the honest debtor. *Northern Trust Co. v. Garman (In re Garman),* 643 F.2d 1252, 1257 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). Consequently, objections to discharge under 11 U.S.C. § 727 should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *Soft Sheen Prods., Inc. v. Johnson (In re Johnson),* 98 B.R. 359, 364 (Bankr.N.D.Ill.1988); *Filmar, Inc. v. White (In re White),* 63 B.R. 742, 744 (Bankr.N.D.Ill.1986).

The Bank has the burden of proving the objections. Fed. R. Bankr.P. 4005. The ultimate burden of proof in a proceeding objecting to a discharge lies with the plaintiff. *First Federated Life Ins. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir.1983). The objector must establish all elements by a preponderance of the evidence. *See Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 n. 17 (4th Cir.1994); *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992); *First Nat. Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10 th Cir.1991); *see also Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991) (established preponderance of the evidence standard regarding dischargeability determinations under 11 U.S.C. § 523). Because denial of discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt nondischargeable. *See Johnson*, 98 B.R. at 367 ("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor."). The Bank argues that the inaccuracies on the Schedules and Donald's failure to list his second job or testify about it at the creditors' meeting were knowing and fraudulent in connection with the case making a materially false oath.

Section 727(a)(4)(A) of the Bankruptcy Code provides as follows:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account

11 U.S.C. § 724(a)(4)(A). The purpose behind this subsection is to enforce a debtor's duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. *Bensenville Community Center Union v. Bailey (In re Bailey)*, 147 B.R. 157, 163 (Bankr.N.D.Ill.1992) (citations omitted). In order to prevail, the Bank must establish five elements under § 727(a)(4)(A): (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Bailey*, 147 B.R. at 162; *MacLeod v. Arcuri (In re Arcuri)*, 116 B.R. 873, 880 (Bankr. S.D.N.Y.1990). If made with the requisite fraudulent intent, a false statement, whether made in the schedules or orally at a creditors' meeting, is sufficient grounds for denying a discharge provided it was knowingly made and is material. *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr.D.N.D. 1989).

Section 727(a)(4) ensures that debtors will provide reliable information to parties with an interest in the administration of the estate. *Britton Motor Service, Inc. v. Krich (In re Krich)*, 97 B.R. 919, 923 (Bankr.N.D.Ill.1988). It is a debtor's role to consider the questions posed on the schedules and at the creditors' meeting carefully, and answer them accurately and completely. *Lunday*, 100 B.R. at 508.

B. *Application of the Standards to this Matter*

The Bank first must establish that the Debtors made a statement under oath. A debtor's petition and schedules constitute a statement under oath for purposes of a discharge objection under § 727(a)(4). *See Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 320 (Bankr. S.D.N.Y.1994); *Golden Star Tire, Inc. v.*

*Smith (In re Smith),* 161 B.R. 989, 992 (Bankr.E.D.Ark.1993). A statement under oath also includes statements made by the debtor when being examined at creditors' meetings. *See Nerco Coal Corp. v. Ball (In re Ball),* 84 B.R. 410, 415 (Bankr.D.Md.1988). There is no dispute that this element has been met. Second, the Bank must show that such statements were false. Whether the Debtors made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4 th Cir. 1987); *Continental Ill. Nat. Bank & Trust Co. of Chicago v. Bernard (In re Bernard),* 99 B.R. 563, 570 (Bankr. S.D.N.Y.1989). "Filing of false schedules with material omissions or misrepresentations with an intent to mislead creditors and the trustee as to a debtor's actual financial condition constitutes a false oath under section 727(a)(4)(A)." *Krich,* 97 B.R. at 923 (citation omitted). A debtor's failure to disclose income may warrant denial of discharge. *See First Fed. Savs. and Loan Ass'n of Raleigh v. Johnson (In re Johnson),* 82 B.R. 801, 805 (Bankr.E.D.N.C.1988) (citations omitted).

The Court finds that the Bank has established the second element with respect to Donald based on his failure to disclose his second source of income—Midwest Sporting Goods—on either the Schedules or at the creditors' meeting. A debtor's omission of income on his bankruptcy schedules constitutes a false oath or account. *See, e.g., Calder v. Job (In re Calder),* 907 F.2d 953, 955 (10th Cir.1990); *Walton v. Staub (In re Staub),* 208 B.R. 602, 605–06 (Bankr. S.D.Ga.1997); *Nof v. Gannon (In re Gannon),* 173 B.R. 313, 320 (Bankr. S.D.N.Y.1994); *Miller v. Boles (In re Boles),* 150 B.R. 733, 736–37 (Bankr. W.D.Mo.1993); *Grant v. Peacock (In re Peacock),* 154 B.R. 597, 601 (Bankr. M.D.Fla.1993); *Sperling v. Hoflund (In re Hoflund),* 163 B.R. 879, 883 (Bankr. N.D.Fla.1993).

There is no similar problem regarding Diane. Moreover, there was no evidence adduced at trial that she falsified the Schedules regarding her income or expenses or that she was asked any questions at the creditors' meeting to which she gave false answers under oath. A spouse's failure to disclose will not be automatically imputed to the other spouse because each has an independent duty to disclose all of his or her assets and liabilities, notwithstanding the Bankruptcy Code's provision which allows spouses to file a joint case. *See* 11 U.S.C. § 302. Each joint debtor has a separate estate unless the two estates are substantially consolidated under § 302(b). *See Ageton v. Cervenka (In re Ageton),* 14 B.R. 833 (9th Cir. BAP 1981). Thus, the Bank has not demonstrated this element as to Diane.

Third, the Bank must establish that the Debtors knew that the statement was false. The form Schedule I requires debtors to list all current employers, not just those selected by the debtor. Neither the original nor the amended Schedule I referenced Donald's part-time employment with Midwest Sporting Goods. The obvious impression created when reviewing those Schedules was that he had but one employer—Magnetrol. This omission was a false statement by Donald that he knew was false. Hence, the Court finds that the Bank has demonstrated this element by a preponderance of the evidence. No such evidence was presented, however, regarding Diane as to this element.

Fourth, the Bank must prove that the Debtors made the statements with fraudulent intent. To find the requisite

degree of fraudulent intent, the Court must find that the Debtors knowingly intended to defraud the Bank or engaged in behavior which displayed a reckless disregard for the truth. *In re Yonikus,* 974 F.2d 901, 905 (7th Cir. 1992); *Bailey,* 147 B.R. at 165. If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the party seeking denial of the discharge need not offer any further evidence of fraud. *Calisoff v. Calisoff (In re Calisoff),* 92 B.R. 346, 355 (Bankr.N.D.Ill. 1988). The requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence. *Yonikus,* 974 F.2d at 905; *Bailey,* 147 B.R. at 165; *Krich,* 97 B.R. at 923. However, discharge should not be denied where the untruth was the result of mistake or inadvertence. *See Lanker v. Wheeler (In re Wheeler),* 101 B.R. 39, 49 (Bankr. N.D.Ind.1989). The misstatement or omission must have been made knowingly and fraudulently; mere negligence is not sufficient to deny discharge to debtors. *Bernard,* 99 B.R. at 570. A discharge will not be denied if the debtor made the false oath inadvertently, carelessly, or under a mistaken belief. *American State Bank v. Montgomery (In re Montgomery),* 86 B.R. 948, 957 (Bankr.N.D.Ind.1988). By signing the last page of the Schedules and Statement of Financial Affairs, the Debtors certified that they read each document and that they were true and correct to the best of their knowledge. Donald's failure to disclose a source of income from a second employer from whom he was regularly receiving some income, albeit small, yet purporting to include those dollars as part of the income from the disclosed principal employer, is beyond mere negligence and unintentional distortion of the true facts on his part, especially when same could have been revealed in the amended Schedule I or at the first meeting of creditors. After all, debtors are afforded a virtually unfettered right to amend their schedules as a matter of course under Fed. R. Bankr.P. 1009(a) at any time before their case is closed. Donald's omission was at least a "reckless indifference to the truth." Accordingly, the Bank has demonstrated this element as to Donald, but not Diane.

Finally, the Bank must show that the false statement related materially to the bankruptcy case. The debtor's false oath must relate to a material matter before it will bar a discharge in bankruptcy. *Lee Supply Corp. v. Agnew (In re Agnew),* 818 F.2d 1284, 1290 (7th Cir.1987). The test for materiality of the subject matter of false oath is whether it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Bailey,* 147 B.R. at 162 (citations omitted). A false oath may be material even though it does not result in any detriment or prejudice to the creditor. *Scimeca v. Umanoff,* 169 B.R. 536, 543 (D.N.J.1993), *aff'd,* 30 F.3d 1488 (3d Cir.1994); *Congress Talcott Corp. v. Sicari (In re Sicari),* 187 B.R. 861, 881 (Bankr.S.D.N.Y. 1994). A matter is material if it is pertinent to the discovery of assets, past transactions, or the debtor's entitlement to discharge. *Richter v. Gordon (In re Gordon),* 83 B.R. 78, 81 (Bankr.S.D.Fla. 1988). The Court finds that the failure to list a source of income earned from part-time employment on the bankruptcy schedules constitutes a false statement by omission which relates to a material matter.

Both statements made in bankruptcy schedules and statements of affairs, and

omissions of information from those documents, may fall within the provisions of 11 U.S.C. § 727(a)(4)(A); *In re Stamat*, 635 F.3d 974, 982 (7th Cir.2011). Such matters may include circumstances addressed by question 18 in the Statement of Financial Affairs; *Stamat, supra.*, at 979. *Stamat* also addressed the concepts of "intent" and "materiality" under § 727(a)(4), as follows:

> The Stamats argue that an over-reporting of income cannot constitute an intent to defraud. As both the bankruptcy and district courts noted, a showing of reckless disregard for the truth is sufficient to prove fraudulent intent. *See In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998) (citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir.1992)); *see also In re Duncan*, 562 F.3d at 695 (finding that "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent" under section 727(a)(4)) (citations omitted); *In re Costello*, 299 B.R. 882, 899–90 (Bankr.N.D.Ill.2003). While an over-reporting of one's income by itself would likely not amount to fraudulent intent, this error was part of a larger picture of omissions and errors. Here, the totality of the Stamats' omissions and errors rises above mere negligence to the level of reckless disregard for the truth.
>
> Given the Stamats' level of education and business experience, their failure to disclose the required past business interests, property transfers, and income as discussed above shows a reckless disregard sufficient for the bankruptcy court's finding of intent under section 727(a)(4), and we do not disturb that finding. *See, e.g., In re Chavin*, 150 F.3d at 729 ("Chavin is a mature and experienced businessman...."); *In re Scott*, 172 F.3d at 970 (discussing expectations of sophisticated debtors under

section 727(a)(3)). The Stamats' amendments to their filings on December 7, 2007 and May 8, 2008 also do not negate a finding of intent or cure the initial failures. *See Payne v. Wood*, 775 F.2d 202, 205 (7th Cir.1985) ("The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.").

Finally, a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Retz v. Samson, et al. (In re Retz)*, 606 F.3d 1189, 1198 (9th Cir.2010) (internal quotations and citations omitted); *see also Costello*, 299 B.R. at 900. "In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors." *Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir.1992) (quoting 4 Collier on Bankruptcy, ¶ 727.04[1], at 727–59). Other courts have held that the debtor "may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious." *Id.* (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984)). In other contexts, we have stated that the "successful functioning of the Bankruptcy Code hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." *Ross v. RJM Acquisitions Funding LLC*, 480 F.3d 493, 496 (7th Cir.2007) (quoting *In re Mascolo*, 505 F.2d 274, 278 (1st Cir.1974)). Given that the omitted interests relate to the

Stamats' estate and assets, we cannot find that the Stamats' omissions were immaterial.

*Stamat, supra.,* at 982, 983. A nice summation of the concept of materiality appears in *In re Retz,* 364 B.R. 742, 759 (Bankr.D.Montana 2007), *aff'd* 606 F.3d 1189 (9th Cir.2010):

> The second factor involves whether the false oath related to a material fact. This broadly defined term, materiality, is established if the false statement "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Wills,* 243 B.R. at 62 (citing *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984)). The 9th Circuit Court has, in a bankruptcy crimes case under 18 U.S.C. § 152, determined that materiality includes "(1) matters relating to the extent and nature of the debtor's assets; (2) inquiries relating to the debtor's business transactions or estate; (3) matters relating to the discovery of assets; (4) the history of the debtor's financial transactions; and (5) statements designed to secure adjudication by a particular bankruptcy court." *Wills,* 243 B.R. at 62, n. 3 (citing *United States v. Lindholm,* 24 F.3d 1078, 1083 (9th Cir. 1994)).

The Bankruptcy Appellate Panel in *Wills* provides the following instructive analysis to consider in determining materiality:

> The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations. *Aubrey,* 111 B.R. at 274. "[T]he opportunity to obtain a fresh start is ... conditioned upon truthful disclosure." *Id.* "The entire thrust of an objection to discharge because of a false oath or account is to prevent knowing fraud or perjury in the bankruptcy case. As a result, the objection should not apply to minor errors or deviations in testimony under oath." William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d § 74.11 (1997). A false statement or omission that has no impact on a bankruptcy case is not grounds for denial of a discharge under § 727(a)(4)(A). 6 Lawrence P. King et al., Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. Rev. 1998)(citing *In re Fischer,* 4 B.R. 517 (Bankr.S.D.Fla.1980)). As a result, omissions or misstatements relating to assets having little or no value may be considered immaterial. *See, e.g., In re Waddle,* 29 B.R. 100 (Bankr. W.D.Ky.1983). Likewise, omissions or misstatements concerning property that would not be property of the estate may not meet the materiality requirement of § 727(a)(4)(A). *See, e.g., In re Swanson,* 36 B.R. 99 (9th Cir. BAP 1984). However, an omission or misstatement relating to an asset that is of little value or that would not be property of the estate is material if the omission or misstatement detrimentally affects administration of the estate.

*Wills,* 243 B.R. at 63. Additionally,

> In determining whether or not an omission is material, the issue is not merely the value of the omitted assets or whether the omission was detrimental to creditors. Even if the debtor can show that the assets were of little value or that a full and truthful answer would not have directly increased the estate assets, a discharge may be denied if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully investigate the debtor's prebankruptcy dealing and financial condition. Similarly, if the omission interferes with the possibility of a preference

or fraudulent conveyance action the omission may be considered material. 6 King, Collier on Bankruptcy ¶ 727.04[1][b].

*Wills,* 243 B.R. at 63.

 Finally, the Trustee in part bases his case on 727(a)(5), which states:

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities

This provision is straightforward, but there is still an element of intent in it. As stated in *In re Suttles,* 819 F.2d 764, 766 (7th Cir.1987):

The general rule is that the right to a discharge is left to the sound discretion of the bankruptcy court, *Stout v. Prussel,* 691 F.2d 859, 861 (9th Cir.1982), and that an appellate court will not interfere with the decision of a bankruptcy court to grant a discharge unless there is a "gross abuse of discretion," *Shaver v. Shaver,* 736 F.2d 1314, 1316 (9th Cir. 1984). We hold that the district court was correct in concluding that the bankruptcy court was well within its discretion to grant Marietta Suttles a discharge. *See Matter of Borron,* 29 B.R. 122, 128 (W.D.Mo.1983).

We have stated that the Bankruptcy Code was meant to discharge only an honest debtor from his or her debts, *Matter of Garman,* 643 F.2d 1252, 1257 (7th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981), and that the Code "should be liberally applied to protect the [debtor] only in those cases where there is *no intent* to violate its provisions," *id.* (emphasis added). This language in *Garman* is consistent with our holding that the bankruptcy court did not abuse its discretion in granting Marietta Suttles a discharge.

The bankruptcy court concluded that Marietta Suttles' failure to keep satisfactory records was an honest mistake, and that she did not intend to violate the Bankruptcy Code. Section 727(a)(5) does not require fraudulent intent, as do some other subsections of § 727, *see Collier on Bankruptcy,* ¶ 727.08 at 727–22 (1986).[FN2] Because the bankruptcy court found that Marietta Suttles' violation of § 727(a)(5) was an innocent one, it therefore did not abuse its discretion in granting her a discharge.

FN2. This case does not require this court to decide whether the bankruptcy court's discretion to grant a discharge under a subsection of § 727 that requires fraudulent intent is as broad. Our holding is only that a debtor may violate § 727(a)(5), which has no fraudulent intent requirement, and still receive a discharge.

The foregoing are the principles which will guide the court's decision.

The court particularly directed the Trustee to specifically delineate his contentions as to the manner in which the debtors' conduct failed to comply with requirements which would entitle them to a discharge, or positively established in the Trustee's view that discharge should be denied. Trustee Manning did an excellent job of delineating his points of contention, and in the remainder of this decision the court will address those points under the applicable standards. However, the discussion in this memorandum of decision will not be a blow-by-blow, item-by-item, legal principle-by-legal principle recitation.

Apart from the analytical framework generally established by the applicable law set out above, over my years of practice in the areas of bankruptcy and creditors' rights and in other areas of the law, I have been involved in litigation—both as an attorney and as a judicial officer—in cases too numerous to even begin to count which involved issues of disclosure/ omis-

sion or failure of disclosure, and issues involving intent with respect to the taking of certain actions or the failure to take certain actions. In a similar manner, I have been involved in cases and circumstances in those cases—again too numerous to number—in which the foci of inquiry were statements made in or omitted from documents filed in a bankruptcy case (particularly Schedules and Statements of Financial Affairs), tax returns, and sworn testimony. Particularly in the administration of this court, I have attempted to strike a balance between hyper-technical applications of the law, and the necessity of applying the law in a manner which results in effective administration of the cases which pass through the court. Having read and re-read reported decisions again too numerous to count, I have been repeatedly struck by what I deem certain of those decisions' overly strict application of technical legal requirements to ordinary people in extraordinary circumstances. In my view, too many courts (at least ones whose decisions have been reported) adopt essentially an "all or nothing" approach to cases involving denial of discharge or revocation of discharge, but particularly because of its ramifications, the latter class of cases involving denial of discharge. I suppose many of these decisions derive from the authors' world views that any deviation from full disclosure and absolute candor must be punished in order to advance the goal of full and effective administration of bankruptcy cases, enforcing principles of denial of benefits to those who transgress and principles of general deterrence by sending a message to those who have yet to have an opportunity to appear in the bankruptcy arena. Those are worthy goals indeed, but they can't be advanced in a vacuum created by intense scrutiny of particular actions by particular individuals in a formal legal proceeding into which many of those indi-

viduals came as a result of extreme physical, emotional or economic pressure. In the ordinary course of human events, most people simply don't keep extraordinarily detailed financial records, don't organize their financial records or affairs in a particularly effective way, and do things or fail to do things at times which may not conform strictly to concepts of federal tax law or maintaining a Chinese wall between individual finances and the finances of business organizations in which those individuals are involved. Yet, when certain of these individuals become involved in a bankruptcy case, a standard is imposed upon them which departs from the manner in which ordinary people conduct their ordinary financial affairs in everyday life. Suddenly, they are expected to possess every document which bears on any issue involved in their bankruptcy case, and to have carefully orchestrated each of their financial transactions in a manner which conforms strictly to the types of financial planning that would only be done by an estate planner. Similarly, when an individual comes under the bankruptcy microscope—isolated departures from standards associated with absolute candor and absolute adherence to technical legal requirements in structuring or performing transactions become the basis for a determination of denial or revocation of discharge, when in fact most the population base has engaged in similar conduct but has not had the misfortune of having it analyzed to the nth degree in litigation in bankruptcy.

■■■■■ The foregoing being said, this court has still relatively strictly applied § 727(a) legal principles in a manner which enforces and endorses the concept of full disclosure of material matters in a bankruptcy case. But this form of strict enforcement has not been in a vacuum. Rather, it has been undertaken in a man-

ner which focuses heavily on the intent of the debtor in dealing with creditors, the court and trustees in the manner in which he/she/they did, keeping in view the principle that just because an individual is subject to scrutiny in a bankruptcy case should not result in imposing a higher degree of conduct upon that individual than is generally prevalent in everyday life by most of the everyday population. Denial of discharge is in particular meant to be an extreme imposition of a sanction, to be imposed upon relatively bad people who have consistently done bad things; not so bad people who have done fairly seriously bad things in certain circumstances; or anyone who has done one really bad thing which permeates and precludes the effective administration of a bankruptcy case. It is not meant to be imposed upon an individual who is lax or careless in the conducting of financial affairs or the keeping of records in relation to them—in other words people whose conduct may fall short of strict technical legal requirements but do not evidence the intent of figuratively thumbing their noses at their creditors, bankruptcy trustees and/or the court.

■ The guidepost for this court has somewhat been to measure conduct in relation to § 727(a) cases against the standards applied to determine dismissal of a bankruptcy petition on the ground that it was filed in bad faith. That standard is essentially, whether in reviewing a debtor's conduct as a whole in relation to the case, the court is left with the impression that the debtor sought to thwart creditors, trustees or the court; *see, In re Jongsma,* 402 B.R. 858 (Bankr.D.Ind.2009). Thus, the court's approach to litigated § 727(a) cases—in terms of applying the sometimes relatively strict and harsh criteria enunciated by certain reported decisions to those cases—is to review the debtor's conduct in part in light of the "good faith/bad faith"

analysis which would be applied to a contested matter seeking to dismiss a case, or to deny confirmation of a plan—on bad faith grounds. Put another way, if review of the evidence submitted in a § 727(a) action would *not* result in dismissal of the case if that same evidence were submitted in a contested matter involving a motion to dismiss a case, then the court will not sustain the § 727(a) action. The court views this approach to be in total accord with applicable authority which holds that denial of a discharge is an extraordinary sanction reserved for "bad debtors"; that the general analysis applied in a § 727(a) case, while requiring proof of deviation only by a preponderance of evidence, is to be relatively strict in favor of the debtor; and that *certainly something significantly more* than grounds which would result in dismissal of the case or denial of confirmation of a plan on the grounds of bad faith must be established in order to deny a debtor a discharge under 11 U.S.C. § 727(a).

All of the foregoing now having been stated as the analytical framework to be applied to this case, the court now embarks on its application of those principles to the evidence.

■ Let's turn first to the Trustee's assertions regarding denial of discharge of the debtor Debra Tabla Watkins.

It is necessary to first note the effect of filing a joint petition to commence a bankruptcy case involving a husband and a wife. 11 U.S.C. § 302(a) authorizes filing of a joint case, so that a single petition is filed by an individual and an individual's spouse. 11 U.S.C. § 302(b) then allows the court to "determine the extent, if any, to which the debtors' estates shall be consolidated". The section was not invoked in this case. As a result, there are in fact two separate bankruptcy estates involved in this joint case; Allen's and Debra's. As

is true in most joint cases, the business affairs and property of the spouses are not entirely divisible and separate: there are overlaps with respect to matters addressed by the Statement of Financial Affairs, and there are certain overlaps with respect to Schedules which involve joint property ownership and joint debts.

Most of the issues which the Trustee has addressed concern matters involving Allen—either interests which he individually may have had in property or matters which relate to the conducting of his business affairs. Debra's testimony was clear and convincing. Throughout her relationship with Allen, she essentially "worked in the home" managing the couple's household and attending to the needs of their children. Her involvement in Allen's businesses was limited to helping out, particularly with respect to properties which were acquired for purposes of renovation/rehabilitation and resale, or properties which were managed for entities which acquired them as a result of foreclosures. In this context, her overwhelming primary involvement was planning and managing landscaping, renovating interiors of houses by performing painting and other similar chores, and "prettying" up the interiors of houses to enhance their sale value. She was in no manner engaged in the acquisition of any properties in Allen's business ventures, in financial transactions which were involved in those acquisitions, in transactions which resulted in sales of properties involved in Allen's business ventures, or in financial matters involved in management and disposition of those properties. Not to be pejorative in any manner—Debra's role in the couple's relationship and in financial matters which brought money into that relationship was as an essential and life-fulfilling "stay at home mom". As noted above, the court views it to be necessary to determine the conduct of debtors in cases such as this one in light of common sense standards that apply to the national community and culture at large. In far too many cases to begin to mention, when the sole source of income derives from one spouse's business activities—whether independent or as an employee—and the other spouse's participation in the relationship involves managing a household and/or children, it is a relatively rare case in which the latter spouse has much knowledge at all of the former spouse's business affairs. In fact, in a number of households, perhaps particularly in those of the parents of the baby boomer generation—one spouse (usually the husband) manages all of the couple's household financial affairs, and the other spouse has very little background or knowledge about those affairs. This form of traditional relationship is exactly what Allen and Debra Watkins had. It is not even suspicious that Debra had no real knowledge of Allen's business affairs or transactions—that's just the way it is in many relationships, and the way it was in theirs.

The Trustee's "case" against Debra is focused primarily upon certain joint interests that she may have held in real property, or in business enterprises in which Allen was engaged; and on her admitted use of a business account, primarily utilized by Allen for conducting of his business transactions, against which she drew by means of a debit card to pay for certain personal expenses, many of which involved medical expenses incurred for her or the couple's children's care, or for gasoline expense. The Trustee particularly notes that schedules filed in the case state that interests in Housing Resource Center, Inc. were owned jointly by husband and wife. The Trustee seeks to derive from this statement that Debra should have been aware of the ramifications of the statement and policed statements made in Schedules

and the Statement of Financial Affairs to make certain they were accurate in relation to matters addressed by those documents in relation to that entity. The Trustee also appears to argue that Debra was responsible for disclosing use of what was clearly a separate corporate bank account, occasionally for personal purposes.

As much as those of us who have been involved in the administration of bankruptcy cases might wish otherwise, the Official Form Schedules and Statement of Financial Affairs are not as probingly inclusive as might be desired. The only provision made in those documents with respect to bank accounts are in sub-paragraph 2 of Schedule B, and in section 11 of the Statement of Financial Affairs. The former can only be reasonably construed as requiring disclosure of accounts held in the name of the debtor. That provision does not at all encompass the concept of "accounts from which the debtor drew money for personal purposes". The latter provision in the Statement of Financial Affairs addresses "Closed financial accounts", which in the context of this case does not apply to the corporate business account upon which Debra occasionally drew.[1]

Based upon the evidence, the court determines that the Trustee has failed to establish *any* ground for denial of Debra's discharge under 11 U.S.C. § 727(a)(2)(A) and (B); 11 U.S.C. § 727(a)(4)(A); or 11 U.S.C. § 727(a)(5). The court therefore determines that the Trustee's request that the Chapter 7 discharge of Debra Tabla Watkins be denied, will be DENIED.

We are left with denial of Allen's discharge.

First, the Trustee makes assertions that the court deems either to not be supported by applicable law in relation to the evidence, or that the court determines are clearly controverted by the record.

The first of these involves a GMC Suburban vehicle admittedly titled in Allen's name, and the debt associated with financing of the purchase of that vehicle. Allen testified, very credibly in the court's view, that his involvement with this vehicle arose from the fact that his brother could not obtain financing to purchase a car; that Allen purchased the car in his name and financed it in his name so that his brother could have a car; that his brother made all, or nearly all, of the payments on the car; and that he never considered the vehicle to be his (Allen's). Again this is a circumstance that arises in too many cases to mention in which the author of this opinion has been involved. This is literally characterized as "helping out a family member". Despite the technical ownership evidenced by the certificate of title, it was never intended that the owner evidenced on the certificate was in fact the owner of the vehicle.[2] The Trustee has failed to establish that any issue involved with respect to the GMC Suburban falls within any of the provisions he asserts against Allen in support of denial of Allen's discharge.

---

1. No offense meant to the Trustee, but this theme of disclosure of "they should have said something because I would have, or I view other attorneys to have done so in other cases" arises in several other instances. The proper focus for that argument is the authority which oversees the formulation of the Official Forms. Those Official Forms are what they are, and what they are is imperfect in terms of disclosure of certain circumstances which might routinely arise in a number of cases.

2. It should also parenthetically be noted that there is no fraud in this type of arrangement: the title owner of the vehicle is entitled to do with it whatever he or she desires, including allow its exclusive use to another person, or to in essence "gift it" to another person.

 The Trustee contends that Schedule D is deficient, in that it did not designate either the Internal Revenue Service or the Indiana Department of Revenue as a secured creditor. The Trustee asserts that this is a "misrepresentation" on Schedule D. If as an Assistant United States Attorney, in some manner the author of this opinion was paid even a dime for every set of schedules in a bankruptcy case that didn't designate the IRS or the IDR in Schedule D despite those entities' having lien interests in the debtor's property, the author would have retired from the United States Attorney's Office after about ten years of his tenure there instead of the eighteen years that he actually performed, and would never have applied for the job he now holds. A relatively small number of debtors state either the Internal Revenue Service or the Indiana Department of Revenue in Schedule D despite those entities' holding of a perfected tax lien in the debtor's property[3]. The same can be said of the Trustee's assertion with respect to definitive statement of tax liabilities in Schedule E. In fact, in this context, the author of this opinion could have retired after about three years in the United States Attorney's Office if he had been given a dime for every time this circumstance was encountered. The author could have retired after one year in the United States Attorney's Office if he had been given a dime in every circum-

stance in which the debtor/debtors testified at a § 341 meeting, or even filed a document with the court, which stated that they had filed all of their pre-petition federal tax returns. The point is that it is not reasonable to rely on Schedule D as to whether or not a taxing authority is a secured creditor, and it is not reasonable to rely on Schedule E as to whether or not there may be a tax liability subject to disclosure on that schedule, and *especially the amount thereof*. Because of the manner in which the Internal Revenue Code provides for interest and penalties, one literally has to have a specialized computer program to compute these components, even if one knows the base tax liability. That is simply the bottom line. The court will not adopt a rule which allows these types of omissions/errors/perhaps very rarely an intentional misrepresentation to generally provide a basis for denial of discharge under any section of 727(a).[4]

The court determines that the Trustee has failed to establish any basis for denial of discharge under any of the grounds which he advances with respect to the foregoing—the requisite knowledge and intent have not been proven.

 The next assertion in this category by the Trustee concerns non-disclosure of tax refunds in section 2 of the Statement of Financial Affairs. For years and

---

3. The status of a secured creditor in Schedule D for the IRS requires the proper recording of a federal tax lien. The status of a secured creditor in Schedule D for the IDR requires the proper recording of a tax warrant, or the entry of judgment in a lawsuit for collection of taxes (a mechanism of tax collection now seldom used by the IDR). To establish a violation of 727(a)(4)(A), the Trustee was required to prove that Allen knew that the IRS and the IDR had recorded tax liens, and then that his failure to disclose those liens was an intended fraudulent act. There was no proof of this.

4. The court has rarely seen—maybe once or twice—a circumstance in which a debtor intentionally failed to list a taxing authority as a creditor. It takes an incredibly stupid debtor to do that, and there are admittedly incredibly stupid debtors in the world. A tax lien will always appear on title reports; the tax lien will always be there subject to enforcement. There is nothing as inevitable as taxes—taxes even trump death as an inevitability, because the ability to collect taxes many times transcends the taxpayer's death.

years as a practitioner and now as a judge, this court has been at a loss to explain why the Official Form Statement of Financial Affairs does not have a specific provision for disclosure of tax refunds received in certain periods prior to the filing of the petition. The simple fact is that the SOFA does not have that required disclosure, again as much as the Trustee and even the court might wish it did. The simple fact is that a tax refund is not "income" within the scope of the disclosure requirement of section 2 of the SOFA.[5] Apart from the Earned Income Credit and perhaps a relative few other instances, tax refunds derive from income previously earned by a taxpayer, which are withheld from income to pay federal taxes. If, for example, one discloses one's 2011 income in section 2 of the SOFA in a case filed in 2012, but then receives an income tax refund for 2011, one has done all that section 2 requires. As a matter of law, there is no failure in this case to state an income tax refund with respect to section 2 of the Statement of Financial Affairs, and the court determines that any assertion by the Trustee of a ground for denial of discharge in this context is denied. Moreover, the court has been around the block a few times, and as a result *knows* that trustees pointedly *always* question about tax refunds at § 341 meetings. The Trustee made no issue concerning § 341 testimony in this context, giving rise to the inference that Allen provided necessary information concerning tax refunds to the Trustee.

▇▇▇ The Trustee argues that there are omissions in section 3 of the Statement of Financial Affairs which give rise to grounds for denial of discharge. In this context—and in other contexts in this case—it is important to remember that the debtors were not personally in default to any creditor at the time that they filed bankruptcy, except perhaps in relation to tax liabilities and guarantees of corporate liabilities. This is indeed a rare case in which the debtors met all of their ordinary expenses when they were due, but were in some way compelled to file bankruptcy to deal with the volume of their debt and their inability to deal with that debt in the future. The primary purpose of this provision is to allow for determination, by means of initial disclosure, of any potential for recovery of preferences under 11 U.S.C. § 547. Again, denial of discharge is an extraordinary sanction. In a perfect world, debtors disclose all payments made within the provisions of section 3 of the Statement of Financial Affairs. In the real world, it is a relatively rare case indeed in which *any* transfer is disclosed in that section by any debtor, and the court and trustees are fully aware of this fact. This is not to say that accuracy under this provision can be blown off. However, the instant case isn't a case in which there is any evidence to establish that any significant preferential transfer was made which was not disclosed, i.e., that the debtor fully understood the consequences of disclosure and intentionally failed to disclose a significant transfer. The court determines that the Trustee has failed to establish any ground for denial of discharge with respect to this item, particularly because the record does not establish Allen's actionable intent in this context.

▇▇▇ The Trustee asserts that section 4 of the Statement of Financial Affairs failed

---

**5.** In his argument with respect to this issue, the Trustee noted that it is customary for many debtors' counsel to disclose income tax refunds in this section; that when he represents debtors, he discloses income tax refunds in this section; and that the instructions on the court's website regarding disclosures in this section refer to tax refunds. So be it. This particular judicial officer had no involvement in whatever appears on the court's website in this context, and this judicial officer specifically disavows that instruction.

to list an adversary proceeding in a prior Chapter 13 case which sought a determination of exception from discharge of a debt. That case was dismissed, and the adversary proceeding became a nullity as a result of the dismissal. The fact that the adversary proceeding existed at all was readily ascertainable from the court's record. The court determines that any omission of this adversary proceeding from section 4 of the SOFA does not give rise to any ground for denial of discharge—the record does not sustain Allen's fraudulent intent in this context, and the omission was immaterial.

■ The next item is the Trustee's assertions concerning disclosure of gifts under section 7 of the SOFA. The SOFA states that the Church of the Latter Day Saints was the recipient of gifts within that provision, but the balance of that section is not completed. The court's base determination is that the balance of this section should have been completed. However, Schedule J states a monthly expense of $1000.00 for charitable contributions. It appears that perhaps the actual amount is $1100.00. The question becomes whether, taken as a whole, the debtors' documentation filed in this case with respect to charitable contributions to the Church of the Latter Day Saints is the type of conduct giving rise to a factor to consider in denial of discharge. Based upon the evidence in this case, the court determines that it is not. The base fact of the contribution was disclosed, and the amount of the contribution—although not entirely accurate, but approximately so—was disclosed as an ongoing contribution in Schedule J. The court determines that no basis for denial of discharge has been established with respect to this item.

■ However, there is another regular transfer by Allen which arguably falls within section 7 of the SOFA which might as well be addressed at this time. The evidence establishes that the debtors provided $600.00 per month to Allen's mother to supplement her living expenses. That's the evidence—a regular amount of $600.00 per month was provided by the debtors to Allen's mother for ordinary living expenses—not for luxury expenses; not as a method of hiding money that the debtors would then themselves use; not as a transfer which benefitted the debtors in any way in their personal financial dealings. Allen gave $600.00 per month to his mother to help with her living expenses. Allen did not disclose this fact. First, in the legal context of seeking to define a transfer, this form of transfer might perhaps be viewed as a "gift". But this form of parental support is a fairly esoteric "gift": if an elderly parent lives with a child, and the child's living expenses are increased by $600.00 per month as a result, is the increase a "gift"? Most wouldn't view it as such. There is no evidence to suggest that Allen's mother was a creditor of the debtors, or that the transfer was in any manner made fraudulently to shield the debtors' resources from any creditor. Again, this is the type of ordinary world transaction that many, many people the court encounters as debtors in cases before it do. It is what people do when they have an elderly person in their family, if they are humane and compassionate. This type of transfer is not recoverable under 11 U.S.C. § 547 because it is not in payment of a debt, and it will be a rare case indeed in which this court would ever determine that this type of transaction could be avoided as a fraudulent conveyance in any manner—again, there is no evidence in this case that it was. Without in any manner determining the issue, the court notes that in many circumstances on the Form B22A (Chapter 7 Statement of Current Monthly Income and Means–Test Calculation) this type of

circumstance may result in claiming the recipient of this form of subsidy as a dependent or household member. Interestingly, in this case, the filed B22A form (record # 60 filed on May 15, 2009) is completely blank, except for the signatures of the debtors. In the context of this discussion, all that can be said is that the debtors did not claim Allen's mother as a dependent in any manner in documents filed in this case, and the debtors' 2007, 2008 and 2009 tax returns (admitted into evidence) did not claim her as a dependent, either.[6]

The regular monthly transfer of $600.00 to Allen's mother should have been disclosed in section 7 of the Statement of Financial Affairs. That transfer should perhaps have been disclosed in paragraph 17 of Schedule J. However, the record in this case fails to establish a ground for denial of discharge with respect to this item pursuant to 11 U.S.C. § 727(a)(2), due to the lack of establishing the intent required by that section. Similarly, no basis for denial of discharge has been established with respect to this item pursuant to 11 U.S.C. § 727(a)(5). With respect to 11 U.S.C. § 727(a)(4)(A), based upon the record in this case and not as a matter of law applicable to any other case, and in light of the actual materiality of the non-disclosure in view of considerations of the property which might be available for distribution to creditors in this case—the court determines that the debtors, particularly Allen, did not "knowingly and fraudulently" make a "false oath or account" in relation to this item. The debtors viewed this monthly supplement to be a part of their regular household expense, and while technically it could have been viewed as a transfer or gift, or regular expenditure, subject to disclosure in either section 7 of the Statement of Financial Affairs or in Schedule J, the proof of fraudulent intent required under § 727(a)(4)(A) has not been established by the Trustee.

 The Trustee asserts, based upon the evidence in the case, that section 19 of the SOFA should have disclosed Dolly Tabla, whom the evidence essentially establishes was the bookkeeper/coordinator for Allen's business activities, primarily run through a corporate entity. The court determines that the non-disclosure of Dolly Tabla in section 19 of the Statement of Financial Affairs does not give rise to any ground for denial of discharge under any section advanced by the Trustee: her involvement was almost wholly involved in Allen's separate business enterprises; section 19 relates to the debtor as an individual entity. Moreover, there is no materiality to this lack of disclosure, given the record as a whole.

 The Trustee asserts that the record establishes a transfer within the provisions of 11 U.S.C. § 727(a)(2)(A) with respect to the Internal Revenue Service. The evidence is that the Internal Revenue Service levied on a bank account of a corporate entity utilized by Allen in the conducting of his business; that in response to Allen's actions protesting the levy, the Internal Revenue Service with-

---

**6.** The circumstances of the Form B22A are certainly mysterious. As docket entry # 56, the United States Trustee filed a document which stated that review of the materials filed by the debtors in the case gave rise to the presumption that the debtors' case should be presumed to be an abuse of 11 U.S.C. § 707(b). By record entry # 75, the United States Trustee stated the determination that no presumption of abuse derived. Given the blank Form B22A on the court's record, the United States Trustee's determinations in either context are somewhat a mystery. However, the circumstances regarding the blank B22A serve only to show that in the context of the matter addressed by the court in this decision, the debtors did not assert that Allen's mother was a household member.

drew the levy; and that then in order to avoid a possible future levy on a corporate bank account, Allen transferred the funds from the account upon which the IRS had levied to another business account established in the name of a corporation in which he was involved. The Trustee asserts that the transfer of this account was intended to "hinder, delay or defraud" the Internal Revenue Service in the collection of Allen's individual tax liabilities. This contention has no merit. The record evidence establishes that the account to which the transfer was made was established in the name of a corporation, and was managed essentially in the same manner as was that with respect to the account which the Internal Revenue Service acknowledged was not validly levied for collection of Allen's individual income tax liabilities. So, first, setting up an account in another corporate entity which operated in the same manner as an account which the Internal Revenue Service eschewed any interest in with respect to personal income tax liabilities did not in any manner "hinder, delay or defraud" the Internal Revenue Service—the creditor's collection activities would have been subject to the same principles as it itself adopted in relation to the original account, i.e., it was not subject to collection activities on an individual tax liability. Parenthetically, in this context, taking steps to shield personal assets from collection by not maintaining a bank account in an individual name is not in and of itself fraudulent—there is no requirement in any law that an individual has to establish a bank account in a manner which allows collection by a creditor. The tougher cases involve the use of some form of subterfuge to shield actual personal funds from collection, while deriving all benefit of the use of the personal funds. That is not the case here. The Trustee's contentions concerning the transfer of funds in relation to the Internal Revenue Service

are determined by the court to not establish any exception from discharge under the grounds advanced by the Trustee.

■■■ The Trustee argues that there are misrepresentations with respect to certain parcels of real estate. In this context, the Trustee asserts that several parcels of real estate were designated in Schedule A as being owned by Allen, when in fact they were owned by a corporation. Property owned by a corporation of which the debtor is a shareholder does not constitute property of the debtor's bankruptcy estate; *In re Fowler*, 400 F.3d 1016 (7th Cir.2005). These properties were not required to be disclosed by the debtor in his schedules, and it is therefore difficult to see how any fraud or other act leading to denial of discharge arose by this over-inclusion. The Trustee also asserts that the debtors' tax returns disclose that income was received in 2007 and/or 2008 with respect to properties located at 1041 West 3rd Street, Hobart, Indiana and at 207 Matthews in Hutto, Texas. The Trustee states that the Statement of Financial Affairs does not explain any disposition of these properties which would result in their non-inclusion in documents filed in 2009. It is the Trustee's burden of proof to establish what in fact happened to these properties, given that the time frame of the tax returns pre-dates the creation of the bankruptcy estate. Given the nature of the businesses, the inference clearly arises that these properties were sold in the ordinary course of Allen's business, and that therefore there was no requirement to disclose them in section 10 of the Statement of Financial Affairs. Most importantly, there is no evidence that the debtors, or either of them, had interests in these properties on the date the petition was filed. This item of assertion presents

no basis for denial of discharge.[7]

At this point, it is appropriate to depart from item-by-item analysis, in preface to the final lap around the track in this decision. First, the court determines that no basis to deny Allen's discharge pursuant to 11 U.S.C. § 727(a)(2)(A) or (B) has been established. One of the principal contentions of the Trustee in this context is the circumstance which has been addressed above with respect to the levy by the Internal Revenue Service, and Allen's establishing of a separate bank account in light of that levy. That issue has been fully addressed previously, and no ground for denial of discharge has been established with respect to it. The other potential set of circumstances which may fall within the foregoing provisions is payment made by several entities in which Allen was engaged with respect to his businesses to or on behalf of the debtors subsequent to the filing of the case. Based upon review of the entire record, the court determines that any transaction of this nature was not made with the intent required by 11 U.S.C. § 727(a)(2), but was done in what the debtor/debtors viewed as the ordinary course of operation of Allen's business "empire", as the Trustee at one point in the trial termed it. In short, the court determines that the intent element of 11 U.S.C. § 727(a)(2) has not been established with respect to any issue in this case.

Similarly, the court determines that the Trustee has failed to establish a case under 11 U.S.C. § 727(a)(5). Determination of denial of discharge has not yet been made, and the record establishes to the court's satisfaction the manner in which Allen conducted his business enterprises and why he found himself in the circumstances which apparently gave rise to his desire/need to file a Chapter 7 case. In the court's view, the record fails to establish any loss of assets or deficiency of assets to meet the debtors' liabilities which has not been satisfactorily explained. In this context, it must be remembered that at the time the Chapter 7 petition was filed, the debtors were current on all of their debts, except the possible exception of debts arising from particular real estate transactions involved in Allen's various business enterprises, and tax liabilities—a fact which the Trustee acknowledged on the record of this case.

We are now left with assertions under 11 U.S.C. § 727(a)(4).

Something that litigants in cases of this nature don't have to consider and mostly don't consider—but which the court must consider—is the effect of a determination in a particular case on the general administration of bankruptcy cases before the court. Trustee Manning has done an exemplary job of analyzing somewhat convoluted—although when broken down not that complicated—financial arrangements by which Cecil Allen Watkins conducted his business activities. The court understands the Trustee's frustration, in that the bankruptcy filings—particularly the Schedules and Statement of Financial Affairs—are hardly a model of completeness. But the record also establishes that Cecil Allen Watkins provided the Trustee with an extensive amount of documentation re-

---

**7.** Allen testified at trial that a vacant lot on Stanley Street was jointly owned by him with ABC Property Management. He also testified that a property on Martin Luther King Drive, an apartment, was owned jointly by him and another individual whose name he did not recall, in a partnership. He further testified that certain of the properties designated as jointly owned were not owned by him and his wife. Schedule A does not require the identity of a joint property holder, but merely the designation that the property is jointly owned. There is no evidence in the record that the debtors failed to disclose interests in property which should have been disclosed in Schedule A in this regard.

garding his business transactions, although perhaps not in the format and not within the time frames which the Trustee might reasonably have desired. But the fact remains that this debtor did provide the Trustee with an extensive amount of documentation concerning a number of matters involved in his case, including transactions and materials involved with his various corporate or partnership related business entities. The court will also note—because it is worth noting—that in his testimony, Allen acknowledged making errors in disclosing several matters and in explaining certain matters, with respect to the basic documents filed in his bankruptcy case. This is worth noting because the court was impressed by Allen's candor in his testimony, and with the fact that the provision of voluminous documentation to the Trustee upon request *does* and *should,* have a bearing on a determination of the intent element required under § 727(a)(4). In this context, the court is fully aware of reported decisions that state that an initial failing in disclosure cannot be subsequently corrected by amending schedules or by subsequent disclosure. If one analyzes a number of these cases closely, one will discover that the disclosures made by debtors to which these "homilies of law" are directed occurred only after the debtor had been found out, and involved significant assets or significant circumstances bearing on the administration of a bankruptcy estate for the benefit of creditors.

As stated, in cases like this, the court must be very careful to balance its determination of denial of discharge in light of policies which either enhance, or detract from, administration of future cases. In this context, on the one hand is the policy of sending a message to debtors that full initial disclosure is required, and that there are consequences for not doing so. On the countervailing hand is the policy of encouraging debtors to ultimately fully disclose matters to trustees and the court, even in a circumstance in which initial disclosures may have been found wanting. If one adopts a harsh and restrictive approach to failures to disclose matters in initial bankruptcy filings—particularly Schedules, the Statement of Financial Affairs, and the Form B22A—and has a willingness to loosely interpret the "knowingly and fraudulently" requirement of § 727(a)(4), then what recourse does a court leave to a debtor to subsequently disclose anything? The answer is very little. If in the alternative, the court adopts a policy which views the "knowingly and fraudulently" requirement more pragmatically, then debtors are left with some incentive to *ex post facto* validly participate in the administration of their cases. The court adopts the latter policy. There are indeed cases in which initial bankruptcy filings evidence violations of § 727(a)(4), and no matter what a debtor may subsequently do, the initial "bad act" cannot be undone. This isn't one of those cases.[8]

---

8. In the court's view, the initiation of a case involves not only the initial filings, but also the testimony provided by the debtor in response to a trustee's or creditor's questioning at the § 341 meeting. In this case, Trustee Manning testified to matters which were addressed by him to Allen Watkins in the § 341 meeting, and the court's review of this testimony indicates to the court that certain issues that the Trustee had concerning business transactions were addressed at the § 341 meeting and were explained by Allen. No objection was made to the Trustee's testimony concerning the § 341 meeting, all of which was hearsay evidence and would have been the subject of a valid evidentiary objection. Given the limited illumination of the Trustee's examination of Allen's business transactions at the § 341 meeting, it would *certainly* have been helpful to the court if the transcript of the § 341 meeting had been made part of this record. Neither party sought to do so. The court expresses its hope that in future cases having circumstances similar to this one, ei-

Apart from considerations of administration of future cases in light of the court's determination of cases such as this one, there is a basic underlying premise that permeates the Trustee's case. That premise is that bankruptcy filings—particularly Schedules and Statements of Financial Affairs—are submitted under oath, and that when they are proven to be not entirely accurate, denial of discharge logically follows. That is not the case. The provision which relates to denial of discharge in this context is essentially 11 U.S.C. § 727(a)(4)(A), and that section requires that the "false oath or account" be made "knowingly and fraudulently". The application of the appropriate standard of *scienter* is why the court previously determined that failure to designate the Internal Revenue Service or the Indiana Department of Revenue as a secured creditor, or to accurately state the amount of the indebtedness owed to those creditors, does not constitute a violation of this section—apart from the fact that hardly any debtor ever does accurately disclose this type of information, and the imposition of this kind of standard on debtors flies in the face of common sense and practicality, and the effective administration of cases. As stated, Trustee Manning has done an exemplary job of seeking to understand the debtors' financial circumstances, based upon less-than-adequate disclosures in the initial bankruptcy filings. But, as stated at the outset of this memorandum of decision, what one might wish to be required to be disclosed by Office Forms, and what is in fact required to be disclosed by them, are sometimes in conflict. There is a thread running through the Trustee's trial examination of Allen Watkins which indicates that the Trustee was frustrated that the bankruptcy filings, and provided documents, did not themselves explain the somewhat convoluted business processes employed by Allen Watkins. Basic bankruptcy documents, and even turnover orders concerning documents, do not require detailed explanations: they only require the disclosure of basic facts, and turnover of documents.[9]

As foreshadowed, the critical element in evaluating the Trustee's contentions under 11 U.S.C. § 727(a)(4)(A) is whether sworn statements made by Allen in Schedules and the Statement of Financial Affairs which fall short of the goal of full and accurate disclosure, fell short of that goal because of knowing and fraudulent conduct.

The principal contentions by the Trustee in this regard relate to the following:

1. Failure to disclose accounts under Schedule B, section 2;

2. Failure to disclose interests in incorporated and unincorporated businesses under Schedule B, section 13;

3. Failure to disclose debts owed to Allen Watkins by a business entity (Housing Resource Center, Inc.), either in section 18 or section 35 of Schedule B;

ther the trustee as a plaintiff or the debtor as the defendant will submit the transcript of the § 341 meeting into evidence. It needs noting that the Trustee did not assert any direct issue concerning Allen's § 341 testimony, which leads to the inference that Allen was cooperative and truthful at that examination.

9. The development of an understanding of transactions from basic facts may be undertaken by means of an examination pursuant to Fed.R.Bankr.P.2004. The court understands that in Chapter 7 cases, trustees may be reluctant to pursue this mechanism because of lack of funding in the estate. That is a systemic problem because of the nature of funding of Chapter 7 trustee's compensation. The availability of this mechanism is not impaired by this systemic problem.

4. Failure to disclose closed financial accounts under section 11 of the Statement of Financial Affairs;

5. Failure to disclose property held for another person under section 14 of the Statement of Financial Affairs;

6. Failure to disclose businesses in which the debtor was engaged under section 18 of the Statement of Financial Affairs.

Before undertaking a very limited analysis with respect to the record in this case, it may be instructive to posit a circumstance which is very common in cases before the court, and which bears on disclosures one might expect to see in basic bankruptcy documents. Let's posit a circumstance in which a debtor is engaged in the business of operating multiple restaurant franchises—let's just say McDonald's Restaurants. The debtor has multiple franchise locations, each of which is a "franchisee owned" store, which means that the restaurant operation is owned by the franchisee and not by the parent corporation. In this circumstance, the ownership of the land and building—or the landlord/tenant relationship involving the land and the building if the franchisee rents the land and building from an unrelated entity—is customarily set up in a separate corporation. The management of the restaurants—let's say there are six of them—is set up in a central management corporation. The debtor is the sole shareholder of, and the principal officer and director of, each of the "real estate" corporations, and of the management corporation. Some of the restaurants do well, some don't, and as a result over the course of time, the debtor has personally loaned monies to the management corporation to keep all six of the restaurants afloat, or has not taken a "draw" from the management entity. The loan may or may not be evidenced by rock-solid documentation, but the fact remains that the debtor has in some manner put his personal money into, or left his money in, the management company to keep the restaurants afloat, and the management company has a debt to the debtor as a result. Prior to the filing of bankruptcy, the debtor determined that three of the restaurants were totally unprofitable, and the management entity ceased operating them. The physical facilities (land and building) were either allowed to revert to the landlord in the case of a lease, or be the subject of foreclosure actions or other actions which resulted in termination of the "real estate" corporation's interests in those properties. In this context, what would one expect to see in the individual shareholder's bankruptcy schedules in relation to these transactional arrangements? Based upon the information required to be disclosed by the Official Forms, one would expect to see the following:

1. With respect to section 18 of the Statement of Financial Affairs, the disclosure of the debtor's involvement in the real estate corporations and in the management corporation, *if the debtor was "an officer, director, partner or managing executive of a corporation, partner in a partnership, sole proprietor"*. The mere status of a shareholder in this circumstance is not required to be disclosed by section 18 of the SOFA.

2. In the foregoing scenario, because bank accounts of each of the separate corporations were bank accounts of a separate legal entity held in the name of that entity, one would not expect to see corporate bank accounts listed in section 11 of the SOFA with respect to the real estate corporations which ceased doing business prior to the filing of bankruptcy. The phrase "for the benefit of the debtor" in that section refers to an account which is exclusively, or primarily, an individual account

in the name of another, such as a self-administered trust or custodial account.[10]

3. Under this scenario, the bank accounts maintained by each of the corporate entities is a corporate account, and there can be no expectation that any of those accounts would be disclosed in paragraph 2 of Schedule B.

4. To the extent that any of the corporations remain viable in any way—i.e., had not been formally dissolved in some manner—one would expect the debtor's shareholder interest to appear in paragraph 13 of Schedule B.

5. One would expect that any debt owed by the management corporation to the debtor would appear in either section 18 or section 35 of Schedule B.

■ While not a perfect match, the foregoing is a relatively decent analogy to the manner in which Allen Watkins set up and conducted his business enterprises. It is essentially an inverted funnel, with the management entity at the narrow end of the funnel.

The record establishes that Allen did not accurately state information regarding personal accounts required by section 11 of the SOFA and by section 2 of Schedule B, even when one considers the amendment to Schedule B filed by the debtors. However, the court determines that the record did not establish that this failure to disclosure was undertaken "knowingly and fraudulently". Additionally, a necessary component of denial of discharge under § 727(a)(4)(A) is the materiality of a statement made under oath, and in the context of this case, the court determines that any non-disclosure of personal bank accounts is not material. In the context of the scenario posited by the court as a preface to this discussion, various corporate entities' bank accounts simply don't fit into requirements of disclosure under the Official Forms.

Section 14 of the Statement of Financial Affairs requires disclosure of "Property held for another person" "that the debtor holds or controls". The issue presented in this case in this context essentially involves closing escrow accounts, which were not held by Allen Watkins individually but rather were held in another entity, or certainly under another entity's control. Whether or not certain disclosures should have been made under this section—which is not at all certain—the court finds that any failure to do so was not "knowingly and fraudulently" done.

With respect to disclosure under section 18 of the SOFA, the evidence establishes that Allen definitely did not disclose his involvement in certain corporations, both traditional and limited liability corporations, which should have been disclosed, in relation to his involvement in them within the six years immediately preceding the commencement of the case. The actual purpose of this disclosure in the Statement of Financial Affairs in relation to the six-year period dictated is somewhat lost upon the court, unless most states have a six-year statute of limitation with respect to fraudulent conveyances in the context of a closely-held business entity. Otherwise, the provision is intended to allow for exploration of transactions between the debtor and closely-held entities. Did Allen Watkins fail to comply with this provision? The answer is yes. However, based upon the entire record, including the fact that most of the business entities that should have been disclosed in this provision were limited to segregated business arrange-

10. As the theme of this decision connotes, the Official Forms are inadequate in certain con-texts, and this is one of them.

ments and transactions which were long ago closed or completed, the materiality of this disclosure is lacking. This is not to excuse the fact of non-disclosure. However, based upon the record as a whole, the court determines that the failure to disclose under this provision was not "knowing and fraudulent".

There are failures to disclose existing interests in corporations, which one would expect to find in section 13 of Schedule B. However, based upon the entire record, the existence of these interests is not material with respect to administration of this bankruptcy estate. The primary interests of Allen Watkins which were in existence on the date of his filing of bankruptcy were those in Housing Resource Center, Inc. and in an entity designated as "A Management, LLC". The interests in Housing Resource Center, Inc. were adequately disclosed in bankruptcy filings. Allen Watkins testified that A Management, LLC was owned by another person—Linda Pence—and whether or not that is technically accurate, the court is satisfied that Allen's failure to include A Management, LLC under section 13 of Schedule B was not done "knowingly and fraudulently".

Finally, the evidence clearly establishes that Housing Resource Center, Inc. owed Allen Watkins a debt on the date of the filing of the petition, arising from his loans made to that entity throughout the operation of his business enterprises. The amount of this debt was ultimately disclosed to the Trustee, but it did not appear in the debtors' bankruptcy filings. It should have appeared in section 18 of Schedule B, which it did not. However, section 13 of Schedule I as originally filed discloses $8,959 per month as income, derived from "Money being paid back from loan to Housing Resource Center". While this Schedule I statement does not excuse non-disclosure of that debt in Schedule B, that disclosure—in conjunction with the record as a whole—convinces the court that the failure to disclose the debt owed by Housing Recourse Center, Inc. to Allen Watkins in Schedule B was not "knowingly and fraudulently" omitted.

This has been one of the most difficult determinations which the court has ever been called upon to make, hence the time taken to enter the decision. The record establishes that Allen Watkins [11] failed to disclose items which should have been disclosed in both Schedule B and the Statement of Financial Affairs. Due to that failure, he technically made a "false oath" with respect to those documents. However, as previously discussed, the failure to make a disclosure under oath, or the failure to make a complete disclosure under oath, in bankruptcy documents will not in and of itself give rise to a ground for denial of discharge—the failure must be undertaking "knowingly and fraudulently". This is true regardless of the cumulative number of failures, if the required intent is not established. The record simply does not establish that Allen Watkins "knowingly and fraudulently" made a false oath with respect to matters involved in this case. The court spent a great deal of time previously in this memorandum discussing its experience in cases in which circumstances similar to those involved in this one arose. The court has denied discharge to persons whose initial failures were similar to those of Allen Watkins, but those cases involved a debtor who repeatedly failed to disclose anything to the trustee or the court; or whose disclosures were totally inadequate and designed to obfuscate; or who essentially thumbed his/her nose at the court

---

11. Given the evidence, Allen Watkins is responsible for preparing and certifying to the accuracy of the documents filed in this case— Debra Watkins has been exonerated in this context.

and thereby evidenced the intent to thwart creditors, or a trustee, or the court. To come full circle, it would be a close call indeed if the court were called upon to dismiss this case for cause based upon an assertion of "bad faith" concerning the filing of this case. Denial of discharge requires more than a close call concerning case dismissal. As frustrating as the administration of this case has been to the Trustee—and the court acknowledges how frustrating the administration was—the message the court desires to send with respect to denial of discharge under § 727(a) is simply not exemplified by this case.

For the reasons advanced above, the court determines that the Trustee's complaint pursuant to 11 U.S.C. § 727(a) should be denied.

IT IS ORDERED, ADJUDGED AND DECREED that the Trustee's complaint for denial of discharge under 11 U.S.C. § 727(a) is denied with respect to both Cecil Allen Watkins and Debra Tabla Watkins.