**In re John Malcolm SNAPE and Rhoda G. Snape, Debtors.**

**Bankruptcy No. 93–07743–8P7.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

March 11, 1994.

Allan C. Watkins, Tampa, FL, for debtors.

Ralph Jay Harpley, Tampa, FL, Trustee.

W. Patrick Ayers, Tampa, FL, for Village of Cross Keys, Inc.

## ORDER ON OBJECTION TO CLAIM OF EXEMPTION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matter under consideration is an Objection to the claim of exemption of John Malcolm Snape and Rhoda G. Snape (Debtors). The Objection was filed by The Village of Cross Keys, Inc. (Cross Keys) an unsecured creditor of the Debtors. The Objection to the Debtors' claim of exemptions asserted by Cross Keys is two-fold. First, Cross Keys contends that the Debtors fraudulently converted non-exempt assets into otherwise exempt assets and, therefore, their right of exemptions otherwise available should be forfeited. Second, it is contended by Cross Keys that § 522(b)(1) of the Bankruptcy Code is unconstitutional because it permits States to opt-out and prohibit its citizens to claim exemptions pursuant to a newly established federal exemption, § 522(d). According to Cross Keys this is a violation of the constitutional mandate which requires uniform legislation on the subject of bankruptcy, U.S. Const. Art. I, § 8. The latter issue is set for hearing on another date and will not be considered in this Order. The facts relevant to the resolution of this controversy, as established at the final evidentiary hearing, are as follows:

Beginning in the early seventies and into the eighties, Mrs. Snape was the principal and sole stockholder of Bun Penny, Inc., (BP) the owner and operator of an upscale gourmet shop at Columbia Mall located at Columbia, Maryland. The mall is owned by Columbia Mall, Inc., which is controlled by The Rouse Company (Rouse). Mrs. Snape also owned and operated a similar store at Harborplace, an upscale shopping mall located in Baltimore, Maryland, which was owned by Harborplace Ltd., a partnership also controlled by Rouse. Because of the success of the Bun Penny shops, and at the urging of Rouse, a third Bun Penny shop was opened by Bun Penny of Cross Keys, Inc., (Bun Penny/Cross Keys), a newly formed corporation by Mr. Snape. The store operated by this corporation was located at The Village of Cross Keys Mall owned by Cross Keys, which is a wholly owned subsidiary of Rouse.

In February, 1989, Bun Penny/Cross Keys entered into a 10 year lease with Cross Keys. In addition, Cross Keys loaned $250,000.00 to Bun Penny/Cross Keys in order to finance the costs of build out of the premises covered by the lease. To evidence this loan, Bun Penny/Cross Keys executed a promissory note on April 3, 1989 (Cross Key's Exh. 1). The note was signed by Mr. Snape, individu-

ally, and as president of Bun Penny/Cross Keys. The Note was also guaranteed by Mrs. Snape. (Cross Keys' Exhibit No. 4) The store opened in August, 1989, but immediately ran into serious financial difficulties. The store continued to operate albeit only with the financial support of the Bun Penny store located at Harborplace. After five months of operation, Mr. Snape decided to discontinue operation of Bun Penny/Cross Keys.

On January 22, 1990, Mr. Snape wrote a letter to Anthony Hawkins, the agent of Harborplace, Ltd. (Cross Keys' Exh. 7) stating that he and Mrs. Snape could no longer operate the stores at Cross Keys and that they were surrendering the Bun Penny/Cross Keys as well as the Bun Penny/Harborplace shops back to Rouse. In his letter, Mr. Snape also stated his willingness to assist in the transfer of licenses and informed Mr. Hawkins that they left the assets in the stores in satisfaction of the indebtedness owed to Cross Keys. According to the Debtors, at this juncture, they had no immediate plans, and left for a five to six month vacation in the Caribbean and Europe. Rouse took over the locations and obtained the appointment of a receiver who operated the stores for over one year. The stores were eventually closed and the remaining assets liquidated by the Receiver. It is unclear what, if anything, Rouse obtained from the liquidation of the stores assets.

### Liquidation of Assets

In November and December, 1989, prior to the abandonment of the stores, Mrs. Snape sold approximately $140,000.00 worth of securities. On December 29, or less than a month before the January 22, 1990 letter, the Debtors deposited in Signet Bank, $52,000.00 from the sale of the securities (Cross Keys' Exhibit No. 12).

On January 12, 1990, the Debtors purchased a cashier's check from Signet for $50,000.00 (Exhibit No. 15) and deposited the same, together with a portion of the funds obtained from the sale of securities, in an offshore branch of Barclays Bank PLC (Barclays) in the Cayman Islands. On the same day, the Debtors purchased a C.D. for $100,-

000.00 from Barclays. (Cross Keys' Exhibit No. 18). At the time the Debtors left on vacation, they owned two condominiums, one located in Baltimore, which was purchased in January 1989, and the other located in Topsail, North Carolina, which they purchased in 1986. Both were subject to mortgages and assessments, which the Debtors paid up in advance through March and April respectively.

### The Debtors' Journey Before Settling in Florida

The Debtors gave their attorney Mitchell Stevan a power of attorney authorizing him to handle their affairs during their absence. It is unclear from this record precisely when the Debtors gave to Stevan this power of attorney. During their absence, Stevan handled the Debtors' affairs, as well as received their mail and handled attempts to sell the Debtors' Maryland condominium. In addition, the also arranged for their daughter-in-law to make monthly payments in their absence.

The Debtors initially flew to Miami and from there to the Caribbean and ultimately to Europe where they stayed for several months. Upon their return to the United States in July, 1989, they rented a townhouse in Vermont in order to assist in the care of Ms. Snape's ailing son-in-law. During their six month absence, only their attorney Mr. Stevan, and their family knew their whereabouts. According to Cross Keys these people refused to divulge how to reach the Debtors, however, the Debtors contend no such instruction was made by them to their attorney and family.

Shortly after the letter of abandonment of the two stores, Mr. Michael J. Schwartz, with the law firm of Schwartz & Greenblatt, an attorney for Rouse and its subsidiaries, contacted Mr. Stevan and was informed that the Debtors abandoned both locations; that they became tired of operating retail stores; that they had assembled $100,000 for their retirement years and decided to leave the state. Mr. Stevan refused to reveal their whereabouts when requested to do so and merely indicated their location as "Shangri-la." (Cross Keys Exh. 1)

In early 1991, the Debtors decided to settle in Florida and on April 19, 1991, signed a contract to purchase a home in the Waldon Lake development located in Plant City, Florida. On April 25, 1991, the Debtors directed Barclays to transfer $25,000.00 from their certificate of deposit to their bank account maintained in Vermont. (Cross Keys Exhibit No. 13) upon which they wrote four checks for a deposit on the house totalling $22,732.00. On May 24, 1991, the Debtors established a bank account with Barnett Bank, and deposited $129,732.85 including the remaining $76,532.85 from the Barclays certificate of deposit (Cross Keys Exh. 17). On June 14, 1991, the sale of the house in Waldon Lake was closed, at which time the Debtors paid the balance of the purchase price of $121,296.65. This is the property the Debtors claim as their homestead and exempt pursuant to Art. X, § 4, Fla. Const.

Efforts of Cross Keys to trace the whereabouts of the Debtors had been unsuccessful until early in 1993, when Cross Keys, based on the information provided by the Receiver, traced the Debtors to their Plant City, Florida address. Cross Keys then initiated a state court collection action on the $250,-000.00 note and on the guarantee of the obligation by Mrs. Snape.

On June 19, 1993, the Debtors filed their voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. In their Schedule C, the Debtors claimed as exempt their Plant City house pursuant to Article X, § 4 of the Florida Constitution. On September 15, 1993, Cross Keys filed an Objection to the Debtors' claim of exemption of that home, which is currently before the Court. In the Objection, Cross Keys contends that the funds used to purchase the home were derived from the fraudulent conversion of non-exempt assets.

It is the Debtors' position that they did not believe they were indebted to Cross Keys at the time they purchased the home, because they had surrendered the Bun Penny assets to Cross Keys and did not become aware of Cross Keys' claim until almost two years following the purchase of the home, when Rouse initiated the state court action.

As a general proposition, the provision of the homestead laws should be carried out in the liberal and beneficial spirit in which they were enacted. *Graham v. Azar,* 204 So.2d 193 (Fla.1967). The homestead exemption should be carried out in a liberal spirit in favor of those entitled to the exemption. Fla.Stat. § 222.19. Exceptions to the exemptions should be strictly construed against the party challenging the exemption. *Graham v. Azar, supra.* The law should not be so applied as to make it an instrument of fraud or imposition on creditors. *Hillsborough Invest. Co. v. Wilcox,* 152 Fla. 889, 13 So.2d 448 (Fla.1943).

The subject of exemptions is governed by § 522 of the Bankruptcy Code. Just as in pre-Code law, there is nothing in this Section which deals specifically with the conversion of non-exempt property into exempt property. Cases dealing with this subject generally have concluded that conversion of non-exempt property into exempt property is permitted. *In re Levine,* 139 B.R. 551 (Bankr.M.D.Fla.1992); *In re Decker,* 105 B.R. 79 (Bankr.M.D.Fla.1989). In so holding, these cases have relied on the Legislative History of § 522; *S.Rep. 95–989 and H.Rep. 95–595,* U.S.Code Cong. & Admin.News 1978, p. 5787, respectively, both of which include a statement to the effect that the Debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The Reports also state that the practice is not fraudulent as to creditors, and the Code permits the debtor to make full use of the exemptions to which he is entitled. It is clear, however, that the complete legislative history of the Code indicates that conversion of non-exempt property into exempt property should be permitted only within certain limits—and outright fraudulent bankruptcy planning may exceed those limits and should not be permitted. This view of the legislative history is also in accord with the language of the Code itself and with the general principles of equity. *In re Spoor–Weston, Inc.,* 139 B.R. 1009 (Bankr.N.D.Okla.1992).

Accordingly, when a debtor's right to exemption is challenged on the grounds that the debtor converted non-exempt prop-

erty to exempt property, it is appropriate to inquire into the circumstances surrounding the transfer. There is substantial and respectable authority to support the denial of a debtor's claim to exemptions upon a showing by extrinsic evidence that the debtor converted non-exempt property into exempt property with the specific intent to defraud his or her creditors. *1A Collier 14th Ed.,* ¶ 6.11(5), n. 30. The extrinsic evidence needed to defeat the claim of exemption might be established by a showing that a judgment creditor was about to levy, attach or garnish the non-exempt property just prior to the conversion and this might be sufficient extrinsic evidence to deny the debtor's claim of exemption. *In re Schwarb,* 150 B.R. 470 (Bankr. M.D.Fla.1992); *In re Spoor–Weston, supra.*

█ In the present instance, the facts before the Court create a difficult case because the evidence supporting each inference is in equal balance. On the one hand, the facts support the inference that the Debtors embarked upon an elaborate strategy to prevent the Rouse Company from recovering anything from them by disappearing, successfully preventing the Rouse Company from finding them, and when the Rouse Company was finally able to locate them in Florida, the Debtors had already used all available funds to purchase their homestead placing the funds out of reach of Rouse and all other creditors.

On the other hand, the facts also permit the inference that the Debtor believed that the surrender of the two store locations, especially a successfully operated store in Harborplace, was a satisfactory resolution of the claims Rouse held against them. It is clear that the aggregate value of the two stores was significant, and Rouse did indeed operated the stores for a year through a receiver. Based on this it is not unreasonable to infer that they embarked on an extended journey for the innocent reason of enjoying their well-deserved retirement.

In sum, the evidence is equal to support both propositions. Inasmuch as the Plaintiff must prevail by a preponderance of the evidence, the Plaintiff's case lacks persuasive force to tip the balance of the evidence in its favor. In view of the foregoing, this Court is satisfied that the Debtors did not fraudulently convert non-exempt to exempt assets, and are entitled to the claimed exemption of their Plant City homestead pursuant to Article X, § 4 of the Florida Constitution. However, in view of the outstanding constitutional issues of Cross Keys' objection, it is appropriate to defer ruling on the objection.

ORDERED, ADJUDGED AND DECREED that the Court shall defer ruling on the Objection to Exemption filed by Cross Keys pending resolution of the Constitutional issues of the Objection.

DONE AND ORDERED.