**IN RE: Hoyt Willard COOK, Jr.,
Glenda Ann Cook, Debtors.**

**CASE NO.: 11–50287–KKS**

United States Bankruptcy Court,
N.D. Florida,
Panama City Division.

Signed December 2, 2013

878

Martin S. Lewis, Lewis & Jurnovoy PA, Pensacola, FL, for Debtors.

**MEMORANDUM OPINION OVERRULING OBJECTIONS TO DEBTORS' CLAIM OF HOMESTEAD EXEMPTION (Doc. 68 & 69)**

KAREN K. SPECIE, United States Bankruptcy Judge

A few months before filing their Chapter 7 petition the Debtors received an income tax refund of almost $185,000. They used $155,000 of the refund to make the down payment on a permanent home and another $20,000 to make needed repairs and improvements. During this time the Debtors were temporarily living in a mobile home and were liable on a commercial bank loan of about $3 million. The bank had not yet sued them, but had demanded payment. When loan workout negotiations failed the bank sued and obtained a default judgment. The Debtors filed bankruptcy and claimed the home exempt as homestead. The bank and the Chapter 7 Trustee objected under Section 522(*o*)(4), claiming that the Debtors spent their non-exempt tax refund to purchase and improve an exempt homestead with the intent to hinder, delay, or defraud a creditor. At the initial evidentiary hearing, the bank argued that the Debtors were precluded from defending the objections to their homestead exemption because of a prior default Judgment denying their discharge.

This Court disagreed, took evidence, and ultimately overruled the objections, thus allowing the Debtors their homestead exemption. The bank appealed.

The District Court reversed and remanded for consideration of two questions: 1) whether the Debtors were barred from defending this contested matter under the doctrine of res judicata or by virtue of Federal Rule of Civil Procedure 8(b)(6); and 2) whether consideration of two additional "badges of fraud" argued by the bank on appeal should change the original ruling. This Court answers these questions in the negative. The Debtors' homestead exemption should be allowed and the objections asserted under 11 U.S.C. § 522(o)(4) should, once again, be overruled.

## PROCEDURAL HISTORY

### This Contested Matter

The Debtors, Hoyt and Glenda Cook ("Debtors" or "Cooks"), filed their Chapter 7 petition on May 23, 2011. They listed their home as an asset on Schedule A and as exempt homestead on Schedule C. It is undisputed that they lived in the home as their permanent residence when they filed bankruptcy. A judgment creditor, Centennial Bank ("Centennial"), and the Trustee objected to the Debtors' claim of homestead exemption under § 522(o)(4) alleging that by using their tax refund to purchase and improve their home the Debtors transferred a non-exempt asset into exempt homestead with the intent to hinder, delay, or defraud a creditor.[1] The issues were tried on October 28, 2011.[2] The order overruling the Trustee's and Centennial's objections to the Debtors' homestead exemption was issued on December 7, 2011.[3] Centennial appealed. Neither the Debtors nor the Trustee appeared or filed anything on appeal. While the appeal was pending, the Debtors' bankruptcy attorney withdrew from representing them.[4] Based on the uncontested appellate brief of Centennial, the District Court vacated this Court's ruling and remanded the case for further proceedings.[5] After another evidentiary hearing, this Court took the matter under advisement.

### The Adversary Proceeding

Meanwhile, the Trustee and Centennial filed separate complaints against the Debtors seeking denial of discharge under 11 U.S.C. § 727(a)(2), (3), (4) and (5).[6] In Count I of its Complaint Centennial alleged that the Debtors' discharge should be denied under § 727(a)(2) "for having transferred property of the estate with intent to hinder, delay or defraud a creditor within one year of the petition date."[7] The transfers Centennial referred to in its Count I included the income tax refund at issue, and a series of events involving Mr. Cook's stock in D & G Automotive, Inc.[8] In Count I of her Complaint the Trustee sought the same relief based upon the same alleged transfers.[9] The Debtors filed nothing in response to either Complaint. The two adversary proceedings

---

1. Docs. 68 and 69. Fed. R. Bankr.P. 9014, advisory committee's note ("[T]he filing of an objection to a ... claim of exemption ... creates a dispute which is a contested matter....").

2. The transcript for this hearing is Doc. 193.

3. Doc. 182.

4. Doc. 223.

5. Doc. 230.

6. The Trustee's Complaint was filed in Adversary Case No. 11–05020–KKS. Centennial Bank's Amended Complaint was filed in Adversary Case No. 11–05021–KKS.

7. Doc. 3–1, A.P. No. 11–05021–KKS.

8. Id.

9. Doc. 1, A.P. No. 11–05020–KKS.

were consolidated,[10] the Clerk entered defaults against both Debtors,[11] and two days prior to the evidentiary hearing on the objections to the homestead exemption a default Judgment was entered in favor of Centennial denying the Cooks' discharge "pursuant to 11 U.S.C. § 727(a)(2)-(5)." [12]

## FACTS

### Facts in Evidence Before Appeal [13]

Mr. Cook had been a reputable and successful businessman in the Panama City area for many years, beginning with the ownership of retail stores.[14] After profitably selling the retail stores, Mr. Cook became successful in the motel industry—buying, operating and selling three motels.[15] Mr. Cook sold the first two motels for a profit of approximately $1 million each and sold the third motel at a profit of $5 million.[16] By 2008 the Cooks lived very comfortably in a $5 million home.[17]

The Cooks' financial condition thrived until Mr. Cook ventured into the automobile business.[18] In January 2008 Mr. Cook purchased stock in and became employed by D & G Automotive, Inc. ("D & G"), which on its own and through subsidiaries owned and operated multiple car dealerships.[19] In order to finance the purchase of the D & G stock, the Cooks borrowed $3.3 million from Coastal Community Bank, pledged the purchased stock as collateral and gave the bank a second mortgage on their $5 million home.[20] When the economic bubble burst later in 2008 car dealerships, including D & G, suffered. The Debtors began to struggle financially, and the D & G purchase became the "worst business decision" Mr. Cook "had ever made." [21]

In 2009, Coastal Community Bank, which by that time was itself in financial trouble,[22] pressured the Cooks into selling their home, previously valued at $5 million, for only $2.3 million.[23] Although an officer of the bank had told Mr. Cook that the bank would help him and his wife buy a new home and "re-do" their D & G stock loan; that never happened.[24] Coastal Community Bank kept all of the net sale proceeds from the Cooks' home, applied that money to reduce principal on the D & G stock loan, did not help them buy a new home and did not re-do the D & G stock

---

10. The Trustee's adversary proceeding, A.P. No. 11–05020–KKS, became the main case.

11. Docs. 7 and 8, A.P. No. 11–05020–KKS.

12. Doc. 16, A.P. No. 11–05020–KKS. On December 13, 2012 Mr. Cook filed a pro se motion, in letter form, seeking, *inter alia*, to set aside the default Judgment. This motion was opposed by Centennial and the Trustee and was ultimately denied as untimely. Doc. 29, A.P. No. 11–05020–KKS.

13. The issues were originally tried before now retired Bankruptcy Judge Lewis M. Killian, Jr. The facts recited in this section are adopted from the original order overruling the Trustee's and Centennial's objections (Doc. 182) and the District Court's remand Order (Doc. 230).

14. Doc. 118 at 99–101.

15. *Id.* at 100–101.

16. *Id.* at 101.

17. Doc. 193 at 25.

18. Doc. 118 at 101–102.

19. *Id.* at 20, 22.

20. Centennial Bank's Ex. 1. Centennial Bank is successor in interest to Coastal Community Bank by asset acquisition from the FDIC in its capacity as receiver for Coastal Community Bank.

21. Doc. 75 at 5.

22. Doc. 193 at 18–19, 26, 44.

23. Doc. 193 at 26; Centennial Bank's Ex. 18.

24. Doc. 193 at 28; Centennial Bank's Ex. 22.

loan.[25] Upon the sale of their $5 million home the Cooks moved into their modest vacation property, a mobile home near a lake about twenty five miles away, and began to look for a new place to live.[26] Unable to afford a down payment and without the credit needed for conventional financing, the Cooks focused their search on homes with owner financing.[27]

In the summer of 2010 the Debtors found out that filing an amended 2008 income tax return should entitle them to a tax refund; on September 21, 2010 they signed an application for a refund of $184,769.00.[28] The Debtors first saw the home they ultimately bought sometime in July, August or September of 2010.[29] When they first saw the home the asking price was $1 million or slightly higher and, in Mr. Cook's words, "[t]he house was sixteen years, nearly seventeen years old, and it was kind of rundown on the inside. The roof had been leaking. The back doors had been leaking. And the woman was not putting any money back into it."[30] After negotiating the price down to $800,000 and seller financing of the balance, upon receipt of the tax refund the Cooks signed the sale contract and paid $155,000 down.[31] They closed the purchase on January 3, 2011, moved in, and spent about $20,000 more of the tax refund on needed repairs and improvements.[32]

While in the process of looking for, negotiating the purchase of and buying the home, Mr. Cook continued to meet with bank officers and attorneys in an effort to work out repayment terms on the remainder of the D & G stock loan.[33] By this time, Coastal Community Bank had failed and been taken over by the FDIC.[34] Centennial, successor to Coastal Community Bank through the FDIC, ultimately refused the Cooks' offers of settlement and filed suit against them in mid-January of 2011, after they had bought their home.[35] The Cooks did not respond to that suit. On March 21, 2011 Centennial obtained a default judgment against them.[36]

### Facts Developed after Appeal

While the appeal was pending Mr. Cook testified in a deposition that he had signed a document dated January 31, 2011 at the "request of his bankruptcy lawyer."[37] This conflicted with Mr. Cook's testimony at the initial evidentiary hearing on the objections to exemption that he first met with a bankruptcy lawyer in May of 2011.[38] When presented with his deposition testimony, Mr. Cook remained adamant that he first met with a bankruptcy attorney in April or May of 2011, and explained that the attorney that prepared the document in January was someone he was going to use if he decided to file suit against Mr. Gainer, his prior partner in D & G. Centennial and the Trustee produced evidence that Mr. Cook had an account at Wachovia Bank that was not listed on his bankruptcy Schedules or Statement of Financial Affairs ("SOFA"). According to Mr. Cook, his other account was overdrawn by about

25. Doc. 193 at 27.

26. *Id.* at 29–31.

27. *Id.* at 14, 32–34.

28. *Id.* at 34–35.

29. *Id.* at 35.

30. *Id.* at 37.

31. Debtors' Ex. 5.

32. Doc. 193 at 17, 38.

33. *Id.* at 47–48.

34. *Id.* at 18, 44.

35. Centennial Bank's Ex. 6.

36. Centennial Bank's Ex. 14.

37. Centennial Bank's Ex. 24.

38. Doc. 193 at 42.

$400 so he opened this account in order to write a few checks; the account never had a substantial amount of money in it, and he did not think to tell his attorney about it when filling out his bankruptcy schedules.[39]

## DISCUSSION

### *Florida's Constitutional Homestead and 11 U.S.C § 522(o)(4)*

Section 522(o)(4) of the Bankruptcy Code provides Centennial and the Trustee this platform on which to attack the Cooks' homestead exemption. Had the Cooks not filed bankruptcy a similar attack would not be successful under Florida law.

In Florida, a debtor's homestead exemption may not be denied even if the debtor engaged in "pre-bankruptcy planning" and converted non-exempt property to exempt property on the eve of filing bankruptcy.[40] The same is true if a debtor put the gains of a fraudulent activity into the homestead.[41] A Florida Constitutional homestead is so protected that it cannot be forfeited even if it was being used as an instrumentality of a drug operation or was acquired with funds obtained from a drug activity.[42] In *Havoco of America, Ltd. v. Hill,* the Florida Supreme Court ruled that money or assets fraudulently transferred into a homestead cannot be recovered under Florida's Fraudulent Transfer Statute.[43] In so ruling, the Supreme Court cited to *Bank Leumi Trust Co. v. Lang.*[44]

In *Bank Leumi,* the defendants knew that their creditor, the trust company, intended to commence legal proceedings against them. Within six months of being sued, the defendants had transferred their non-exempt New Jersey assets into a Florida homestead.[45] After an "extensive evidentiary hearing" and notwithstanding its finding that the "Defendants converted their nonexempt assets into exempt assets for the sole purpose of hindering and avoiding their creditors and defeating their claims," the court held:

> [U]nder Florida law, the [judgment debtors] are entitled to the protection provided by the Homestead Exemption, even if their purpose was to defeat Bank Leumi's claims.... Similarly, the homestead exemption does not contain an exception for real property which is acquired in the state of Florida for the sole purpose of defeating the claims of out-of-state creditors.[46]

In large part because Florida and a small handful of other states have unlimited homestead exemptions, in 2005 the federal legislature added Sections 522(o) and 522(p) to the Bankruptcy Code.[47] Sections

---

**39.** Facts regarding the Wachovia Bank account first came out at the final evidentiary hearing on May 30, 2013 through Centennial's and the Trustee's direct examination of Mr. Cook.

**40.** *Havoco of America, Ltd. v. Hill,* 790 So.2d 1018, 1030 (Fla.2001) (holding that "a homestead acquired by a debtor with the specific intent to hinder, delay, or defraud creditors is not excepted from the protection of article X, section 4").

**41.** Creditors may, under certain circumstances involving fraudulent gains or egregious conduct, attain an equitable lien on homestead. *Id.* at 1028.

**42.** *Tramel v. Stewart,* 697 So.2d 821, 824 (Fla. 1997).

**43.** 790 So.2d at 1029.

**44.** 898 F.Supp. 883 (S.D.Fla.1995).

**45.** *Id.* at 885.

**46.** *Id.* at 887.

**47.** The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *See In re Garcia,* No. 09–33208–LMI, 2010 WL 2697020, at *2 (Bankr.S.D.Fla. July 6, 2010).

522(*o*) and 522(p) limit a debtor's homestead exemption in bankruptcy, notwithstanding that the same exemption would be unlimited under state law had the debtor not filed bankruptcy.[48] Section 522(*o*)(4), at issue here, provides:

> (*o*) For purposes of ... [homestead exemptions], the value of an interest in—
>
> . . .
>
> (4) real or personal property that the debtor or a dependent of the debtor claims as a homestead;
>
> shall be reduced to the extent that such value is attributable to any portion of *any property that the debtor disposed of* in the 10–year period ending on the date of the filing of the petition with the intent to hinder, delay, or defraud a creditor and that the debtor could not exempt, or that portion that the debtor could not exempt, under subsection (b), if on such date the debtor had held the property so disposed of.[49]

Because the Cooks acquired their home within ten years of filing bankruptcy, the maximum homestead exemption to which they would be entitled is $292,900.[50] As a practical matter, the Cooks had only about $155,000 equity in their home as of the petition date, so if Centennial's and the Trustee's objections under § 522(*o*) are sustained, the Cooks will have $0 in their home allowed as exempt homestead. Had the Cooks not filed bankruptcy, all of the equity in their home would be exempt homestead, regardless of amount.

In order to prevail on their § 522(*o*)(4) objections the Trustee and Centennial must prove by a preponderance of the evidence that the Cooks' intent, when they used their tax refund to buy their home, was to hinder, delay, or defraud a creditor.[51] In determining the factual issues this Court must view the evidence in the light most favorable to the Debtors.[52] "The homestead exemption should be carried out in a liberal spirit in favor of those entitled to the exemption. Exceptions to the exemptions should be strictly construed against the party challenging the exemption."[53]

### *Res Judicata and Rule 8(b)(6)*

#### *Res Judicata*

Centennial urges here, as it did on appeal, that the Cooks were barred from defending the objections to their homestead exemption, and that this Court should not review or consider any facts outside the four corners of the default Judgment denying the Cooks' discharge, under the doctrine of res judicata or by application of Federal Rule of Civil Procedure Rule 8(b)(6). The District Court mandated this Court to consider "the legal implications of the default entered against the Cooks in the action seeking denial of their discharge."[54] Having done so, this Court again rules that the default Judgment against the Cooks in the adversary proceeding did not prevent them from defending the objections to their homestead

---

**48.** Section 522(p) caps the amount a debtor can claim as exempt homestead at $146,450 if the debtor acquires that homestead within 1,215 days of filing for bankruptcy. Section 522(m) provides that the provisions of § 522 apply separately with respect to each debtor in a joint case.

**49.** 11 U.S.C. § 522(*o*) (emphasis added).

**50.** 11 U.S.C. § 522(p).

**51.** *In re Booth,* 417 B.R. 820, 822 (Bankr. M.D.Fla.2009).

**52.** *In re Snape,* 166 B.R. 184, 187 (Bankr. M.D.Fla.1994).

**53.** *Id.* (citations omitted).

**54.** Doc. 230 at 9.

exemption in this contested matter under the principle of res judicata.

 Res judicata is Latin for "a thing adjudicated," and its primary definition is "[a]n issue that has been definitively settled by judicial decision." [55] The elements of res judicata are:

1. The prior decision must have been rendered by a court of competent jurisdiction;

2. There must have been a final judgment on the merits;

3. Both cases must involve the same parties or privies; and

4. Both cases must involve the same causes of action.[56]

It is the fourth element of res judicata that is absent here: the adversary proceeding seeking denial of discharge did not involve the same cause of action as does this contested matter involving the Cooks' homestead exemption.

Adversary proceedings are governed by Bankruptcy Rules 7001–7087, while contested matters are governed by Bankruptcy Rule 9014. The adversary proceeding by the Trustee and Centennial and this contested matter involve different and independent claims and results that do not overlap. When the Debtors' discharge was denied under § 727, all of the debt that existed as of the petition date remained fully collectable as though no bankruptcy had occurred. Denial of the Debtors' discharge had no legal effect on the homestead status of their property. On the other hand, the objections to homestead exemption are designed to leave the Debtors without a homestead or with a limited amount of homestead exempt from creditors' claims. In this case, if the objections to homestead exemption are sustained, the Debtors will emerge from bankruptcy without a fresh start, without any of their non-exempt assets, and with no homestead. The significance of such a result is why res judicata only applies in situations where that doctrine is truly warranted, and where all four elements are present.

 In *Latman v. Burdette*, the trustee obtained a summary judgment denying the debtor's discharge based on concealment of assets.[57] The trustee then sought to surcharge the debtor's exempt assets.[58] The debtor objected to the trustee's surcharge action, alleging that it was barred by res judicata and election of remedies because the underlying facts for the surcharge action were the same as in the objection to discharge.[59] In holding that neither res judicata nor election of remedies barred the trustee's surcharge action the Ninth Circuit stated: "The premise behind res judicata is finality. The doctrine bars the re-litigation of issues *actually litigated* in a prior suit, as well as issues that could have been litigated in that prior action." [60] That court went on to hold that when determining whether successive lawsuits involve a single cause of action (to satisfy the fourth element of res judicata), courts are to consider: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits

---

55. *Black's Law Dictionary* (9th ed.2009).

56. *In re Barry,* No. 05–40736, 2005 WL 3752228, at *2 (Bankr.N.D.Fla. Nov. 21, 2005).

57. 366 F.3d 774, 782–83 (9th Cir.2004).

58. *Id.* at 783.

59. *Id.*

60. *Id.* (Emphasis added).

arise out of the same transactional nucleus of facts." [61]

Using the *Latman* analysis, res judicata does not apply to prevent the Cooks from defending against Centennial's and the Trustee's objections to their homestead exemption. Only one out of four factors under the *Latman* test is present here—the fourth one: this contested matter and a portion of Count I of the adversary proceeding arise out of the same nucleus of facts (the Cooks' use of their tax refund with which to purchase their home). The other *Latman* factors are missing: Factor (1)—the default final judgment denying the Cooks' discharge will not be affected by a ruling on whether the Cooks' homestead is exempt; factor (2) neither Centennial nor the Trustee introduced evidence of intent to hinder, delay, or defraud in the adversary proceeding because the judgment was entered by default; [62] and factor (3) the two actions do not involve the same right: the adversary proceeding took away the Cooks' discharge but had nothing to do with their homestead exemption. In *Latman*, the Ninth Circuit agreed with a cautionary statement made years earlier by the Eighth Circuit that "in bankruptcy cases 'the principle of res judicata should be invoked only after careful inquiry.' " [63]

In support of her position that the default judgment denying the Debtors' discharge in the adversary proceeding bars the Debtors from defending this contested matter, the Trustee relies on *In re Bush*, an Eleventh Circuit opinion dealing with collateral estoppel. [64] The Trustee's reliance on *In re Bush* is misplaced. *Bush* was strictly limited to non-dischargeability actions under § 523 (not an issue here), did not address res judicata, and had nothing to do with objections to homestead exemption under § 522(*o*)(4) of the Code. [65] More importantly, the facts in *Bush* are distinguishable: in *Bush* the debtor had "actively participated in the prior action over an extended period of time," and the default judgment was entered against him not due to his failure to plead, but as a sanction because of his "dilatory and deliberately obstructive conduct." [66] Notwithstanding that the ruling is distinguishable, the Eleventh Circuit's discussion in *Booth* of the collateral estoppel effect of a default judgment is instructive:

> Ordinarily a default judgment will not support the application of collateral es-

---

**61.** *Id.* (quoting *Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir.1982)).

**62.** The Trustee and Centennial Bank filed affidavits in support of their respective motions for default judgment (Docs. 12 and 14, A.P. No. 11–05020–KKS), but those affidavits do not address intent to hinder, delay, or defraud a creditor.

**63.** 366 F.3d at 784 (citing *Lovell v. Mixon*, 719 F.2d 1373, 1379 (8th Cir.1983)).

**64.** *Bush v. Balfour Beatty Bahamas Ltd. (In re Bush)*, 62 F.3d 1319 (11th Cir.1995).

**65.** The U.S. Supreme Court has held that the principles of collateral estoppel apply in discharge exception proceedings in bankruptcy court. *Grogan v. Garner*, 498 U.S. 279, 285 n.

11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991). Discharge exception proceedings arise under only Section 523 of the Code. *Grogan v. Garner* does not address, nor does it apply, to objections to claims of exemption, which is the issue here.

**66.** 62 F.3d at 1324. The Eleventh Circuit in *Bush* cited to a Ninth Circuit case in which the debtor had also actively participated in the litigation and had been "obstructively" participating for two years before a default judgment was entered against him. *In re Daily*, 47 F.3d 365, 368–69 (9th Cir.1995). The *Daily* court held: "In such a case the 'actual litigation' requirement may be satisfied by substantial participation in an adversary contest in which the party is afforded a reasonable opportunity to defend himself on the merits but chooses not to do so." *Id.* at 368.

toppel because '[i]n the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated.' The circuits which have considered the issue in the context of bankruptcy discharge exception [§ 523] proceedings have adhered to this view.

. . .

The underlying rationale of these decisions is that a party may decide that the amount at stake does not justify the expense and vexation of putting up a fight. The defaulting party will certainly lose that lawsuit, but the default judgment is not given collateral estoppel effect.[67]

The same analysis should apply to res judicata here: because the same issues were not actually litigated in the adversary proceeding, res judicata should not prevent the Debtors from litigating this contested matter.

Res judicata does not preclude the Cooks' defense of their homestead exemption for another, even more basic, reason: it is impossible to determine what the default Judgment against the Cooks was based on. Centennial's Complaint comprised four counts, each seeking denial of discharge under a different subsection of 11 U.S.C § 727:(a)(2), (3), (4) and (5). Only Count I mentioned the use of the tax refund to purchase and improve the homestead; that Count also alleged other, entirely unrelated, transfers as a basis for relief under § 727(a)(2). The default Judgment denied the Cooks' discharge based on all four of the subsections of § 727, without specifying which of the alleged facts formed the basis for the judgment.

Neither of the two cases cited by Centennial applies in this case because neither of them involved a judgment entered by default. In *Weston v. Goss*, the bankruptcy court sustained an objection to exemption under § 522(g) after entering a judgment, after a trial on the merits, declaring a debt non-dischargeable under § 523.[68] Because the same burden of proof applied to the § 523 adversary proceeding and the objection to exemption, the bankruptcy court accorded res judicata effect to the § 523 judgment. This ruling was upheld by the Tenth Circuit in an unpublished decision.[69] In *In re Downs*, a bankruptcy court gave res judicata effect to a *stipulated* judgment in an adversary proceeding to bar the debtors from litigating the same stipulated facts in defense of an objection to their homestead exemption.[70]

The default Judgment denying the Cooks' discharge was neither based on a trial on the merits nor upon facts stipulated to by the Cooks, so res judicata does not apply to bar the Cooks' defense of their homestead exemption. As stated at the beginning of the October 2011 hearing, this Court must make "an independent determination of the Debtor's intent" for purposes of this contested matter.[71]

### Fed.R.Civ.P. 8(b)(6)

█ Just as the Debtors' defense of their homestead exemption is not barred by res judicata, neither is it barred by operation of Rule 8(b)(6).

Federal Rule of Civil Procedure 8(b)(6) states, in pertinent part: "An allegation—other than one relating to the amount of damages—is admitted if a responsive

---

67. 62 F.3d at 1323–24 (citations omitted).

68. 69 F.3d 549, at *2 (10th Cir. Oct. 26, 1995).

69. *Id.*

70. 205 B.R. 93, 95 (Bankr.N.D.Ohio 1996).

71. Doc. 193 at 6; Doc. 230 at 8.

888

pleading is required and the allegation is not denied." Centennial and the Trustee received the benefit of Rule 8(b)(6) in the adversary proceeding upon entry of the default Judgment. Once the default Judgment became final the adversary proceeding was over. At that point the provisions of Rule 8(b)(6) had been met and its applicability ended.

Centennial and the Trustee argue that under Rule 8(b)(6) the Cooks are "deemed to have admitted" for purposes of this contested matter all facts alleged in the complaint filed in the adversary proceeding. They do not cite, nor has this Court found, authority that supports their position that Rule 8(b)(6) crosses between two different legal proceedings. The case on which Centennial and the Trustee rely is *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*[72] In *Eagle Hosp.* the Eleventh Circuit held that facts deemed admitted by default must be taken as true for purposes of the defaulted party's appeal *of the same case.*[73] The Eleventh Circuit's decision in *Eagle Hosp.* did not involve, nor is it precedent for, using Rule 8(b)(6) in two completely separate legal proceedings.

This being a contested matter, Rule 8(b)(6) does not apply in any event. Bankruptcy Rule 9014 dictates which rules of procedure govern contested matters, and Rule 8(b)(6) is not among them.[74]

72. 561 F.3d 1298 (11th Cir.2009).

73. *Id.* at 1307.

74. Rule 8(b)(6) is incorporated into the Bankruptcy Rules by Bankruptcy Rule 7008, which is not listed among the rules applicable to contested matters, including this objection to the Cooks' claim of exemption, by virtue of Bankruptcy Rule 9014(c).

75. *In re Booth,* 417 B.R. at 823 (quoting *Clark v. Wilmoth (In re Wilmoth),* 397 B.R. 915, 920

### Section 522(o)(4) Objection to Homestead Exemption

*Proof required under § 522(o)(4)—Property transferred with "intent to hinder, delay, or defraud" "a creditor"*

Section 522(o)(4) requires a finding that the Cooks spent their tax refund on purchasing and improving their home with the "intent to hinder, delay, or defraud" "a creditor." One of the issues on remand is whether two specific "badges of fraud" are present here such that this Court's original decision should be changed.

Even if the two specific badges of fraud argued by Centennial on appeal are present, "there *must* be extrinsic evidence of fraud, other than the badges of fraud themselves, to support a finding of intent to defraud."[75] "Absent extrinsic evidence of fraud ... the debtor's mere conversion of non-exempt property to exempt property, even while insolvent, is not evidence of fraudulent intent as to creditors."[76] This Court originally held that Centennial and the Trustee failed to present extrinsic evidence that the Cooks acted with intent to hinder, delay, or defraud a creditor when they used their tax refund to buy and improve their homestead. Nothing has changed.

In a case with similar facts, *In re Booth,* a debtor purchased a home two months before filing bankruptcy and claimed it as exempt homestead; the trustee objected.[77]

(8th Cir. BAP 2008)). *See also In re Maronde,* 332 B.R. 593 (Bankr.D.Minn.2005) (noting that "while a debtor may convert nonexempt assets into exempt assets on eve of bankruptcy, BAPCPA's Section 522(o) requires that conversion not be done with intent to defraud creditors, as manifested by extrinsic evidence.").

76. *Hanson v. First Nat'l Bank,* 848 F.2d 866, 868 (8th Cir.1988).

77. *In re Booth,* 417 B.R. at 822.

Undertaking an "intent analysis," the bankruptcy court found that the debtor had searched unsuccessfully for months to find a home, and that she was fearful she would lose the home she then had (which was worth considerably less than she owed) and "have no place to live." [78] The court believed the debtor's testimony that she intended to pay her credit cards and did not intend to file bankruptcy when she finally bought the home. Finding that "[t]he Debtor was credible throughout her testimony," the *Booth* court concluded that the trustee failed to establish, by a preponderance of the evidence, that the debtor's homestead exemption claim should be disallowed, stating:

> The Debtor's course of action on its face, from a Chapter 7 Trustee's perspective, could be perceived to be motivated by improper intent. *The surrounding circumstances and facts* establish her course of action was not designed to manipulate the exemption system. All of her actions were made in good faith.[79]

As in *Booth,* after two evidentiary hearings this Court believes that the Cooks did not intend to file bankruptcy and thought they could still work things out with Centennial when they bought their home. This Court also believes the Debtors' testimony that their intent was to find a permanent home to replace the one they had sold under pressure from the bank, and was not to hinder, delay, or defraud anyone.

 Centennial and the Trustee urge, as Centennial did on appeal, that the

Cooks' failure to list the receipt of their income tax refund in their SOFA constitutes extrinsic evidence of their alleged fraudulent intent when they spent the refund on their homestead.[80] This Court disagrees. The court in *In re Booth* disagreed with a similar argument. Omissions from bankruptcy schedules may be relevant to denial of a debtor's discharge but are not necessarily relevant to an objection to homestead exemption. The key date for determining a debtor's intent "pursuant to the plain language of 11 U.S.C. § 522(*o* )," is the date the debtor acquired the exempt property.[81] That critical date for the Cooks is the date on which they spent their refund on their homestead; not the date five months later when they filed their Chapter 7 petition.[82] As the court in *In re Booth* stated, "[t]he Debtor's bankruptcy papers filed on the Petition Date and post-petition are not indicative of her intent when she purchased the Property." [83] The facts before this Court parallel those in *In re Booth,* and so should the ruling.

Another distinction of significance is that cases in which courts have sustained objections to homestead exemptions under § 522(*o* )(4) appear to have involved debtors who converted nonexempt assets that they had owned for a considerable period of time. That is not the case with the Cooks, who did not have and were not aware of an income tax refund until just before buying their home. None of the cases cited by Centennial or the Trustee

---

**78.** *Id.* at 824.

**79.** *Id.* at 825 (emphasis added).

**80.** At the evidentiary hearing post-remand the evidence showed that the Cooks also failed to list an account at Wachovia Bank, which fact Centennial and the Trustee also urge as extrinsic evidence of fraudulent intent. In regards to the tax refund, this extrinsic "evidence" is not evidence at all; as the Court

will discuss below, the disclosure of an income tax refund in this Court's view is not mandated by the SOFA form.

**81.** 417 B.R. at 823.

**82.** In fact, the Cooks paid the $155,000 down on their home in November of 2011, which was six months before they filed bankruptcy.

**83.** 417 B.R. at 823.

involve non-exempt property that appeared, like the tax refund here, unexpectedly; rather, in all of those cases the debtors had owned the non-exempt assets for some time before converting them to exempt assets.[84] The Trustee and Centennial urge that one of such cases, *In re Osejo*, should control the result here. In *Osejo*, the debtor sold non-exempt securities in a series of transactions concluding within two months pre-petition and used the proceeds to purchase and improve a home.[85] She not only failed to list her sales of the securities, she also failed to disclose almost $200,000 in retirement accounts and $105,000 owed to her by her ex-husband in her bankruptcy papers. She finally disclosed these items the day of the rescheduled § 341 meeting and after the trustee had hired an attorney to investigate.[86] The transfers and assets that the debtor in *Osejo* failed to disclose were unquestionably required to be listed on the schedules and SOFA, unlike the income tax refund the Cooks received months before filing bankruptcy. The *Osejo* court, obviously disenchanted with the *Osejo* debtor, found that her omissions "were, as a whole, material and intentional," and evidenced a pattern of behavior that the court was simply not prepared to condone.[87]

The holding in *Osejo* does not dictate the same result here. The Cooks did not sell an asset or dispose of money they had had for a long time nor did they hide their homestead, the refund or other significant assets. Rather, they spent a tax refund that came to them unexpectedly, like manna from heaven, at a time when they were virtually penniless. They, like the debtor in *In re Booth*, used the tax refund to buy a home for which they had been searching for a long time.

*Consideration of two additional "badges of fraud" argued by Centennial and the Trustee should not change this Court's initial ruling*

The District Court remanded for consideration two "badges of fraud" from the list set forth by the Eleventh Circuit in *In re XYZ Options, Inc.*: (3) the transfer was concealed; and (7) the debtor removed or concealed assets.[88] Centennial and the Trustee argue that the Cooks' failure to list receipt of their tax refund in answer to Question 2 of their SOFA proves these badges of fraud. This argument is unpersuasive. Question 2 of the Statement of Financial Affairs reads, in pertinent part:

State the amount of income received by the debtor other than from employment, trade, profession, operation of the debtor's business during the **two years** immediately preceding the commencement of this case. Give particulars.[89]

---

84. *See In re Osejo,* 447 B.R. 352 (Bankr. S.D.Fla.2011) (proceeds from the sale of securities); *In re Keck,* 363 B.R. 193 (Bankr. D.Kan.2007) (cash advances on existing lines of credit). *See also In re Cipolla,* 541 Fed. Appx. 473 (5th Cir.2013) (proceeds from encumbering debtor's second home); *In re Thaw,* 496 B.R. 842 (Bankr.E.D.Tex.2013) (assets from companies the debtor controlled and the debtor's bank accounts); *In re Chastain,* No. 10–37341–SGJ, 2011 WL 5079529 (Bankr.N.D.Tex. Oct. 25, 2011) (proceeds of the sale of the debtor's previous homestead).

85. 447 B.R. at 353.

86. *Id.* at 354–55.

87. *Id.* at 355. The debtor's omissions in *Osejo* were of assets and transfers that are required to be disclosed, unlike receipt of an income tax refund that arguably is not mandated to be listed.

88. 154 F.3d 1262, 1272 (11th Cir.1998). Badges 1, 2, 4, 5 and 9 and 10 are present here. Badges 6, 8 and 11 are not relevant to this case.

89. Official Form B 7.http://www.uscourts.gov/ FormsAndFees/Forms/BankruptcyForms. aspx.

"Refund" is defined as "an amount of money that is given back to someone who has returned a product, paid too much, etc."[90] "Income" is defined as "money that is earned from work, investments, business, etc."[91] Because an income tax refund is just that—a refund of money already paid to the IRS based on income earned—it is understandable for a debtor not to list receipt of an income tax refund as "income" in answer to Question 2 of the official SOFA form. In *In re Watkins*, the trustee objected to the debtor's discharge asserting, among other things, that the debtor failed to disclose tax refunds in Question 2 of the SOFA.[92] In overruling the trustee's objection the *Watkins* court stated:

> For years and years as a practitioner and now as a judge, this court has been at a loss to explain why the Official Form Statement of Financial Affairs does not have a specific provision for disclosure of tax refunds received in certain periods prior to the filing of the petition. The simple fact is that the SOFA does not have that required disclosure, again as much as the Trustee and even the court might wish it did. The simple fact is that a tax refund is not "income" within the scope of the disclosure requirement of section 2 of the SOFA. Apart from the Earned Income Credit and perhaps a relative few other instances, tax refunds derive from income previously earned by a taxpayer, which are withheld from income to pay federal taxes. If, for example, one discloses one's 2011 income in section 2 of

the SOFA in a case filed in 2012, but then receives an income tax refund for 2011, one has done all that section 2 requires. As a matter of law, there is no failure in this case to state an income tax refund with respect to section 2 of the Statement of Financial Affairs, and the court determines that any assertion by the Trustee of a ground for denial of discharge in this context is denied.[93]

In *In re Smorto*, an appellate court had no quarrel with a debtor believing that tax refunds were already accounted for in gross income and that there was no place on the SOFA that required him to list tax refunds received pre-petition.[94] The court upheld the bankruptcy court's finding that:

> To count these taxes again would be overstating the debtor's income. Moreover, while it is certainly the case that any tax refunds due after the petition is filed are property of the estate, this refund was received before the petition was filed. The only way to account for it would be if it was not spent and therefore constituted personal property of the estate.[95]

The District Court in *Smorto* held that the trustee had not produced any evidence sufficient to disturb the bankruptcy court's finding that the debtor did not act with fraudulent intent by not listing tax refunds as income on his SOFA.[96]

Neither Centennial nor the Trustee cite a single case where an objection to a debtor's homestead exemption was sustained based solely on the fact that the debtor did not disclose in his bankruptcy papers that

90. "Refund." Merriam–Webster.com.2013. http://www.merriam-webster.com (25 November 2013).

91. "Income." Merriam–Webster.com.2013. http://www.merriam-webster.com (25 November 2013).

92. 474 B.R. 625, 645 (Bankr.N.D.Ind.2012).

93. *Id.* at 645–46 (citations omitted).

94. *In re Smorto*, No. 07–CV–2727(JFB), 2008 WL 699502, at *8 (E.D.N.Y. Mar. 12, 2008).

95. *Id.* at *3.

96. *Id.* at *8.

he had received an income tax refund pre-petition. The cases relied on by Centennial on this narrow issue are distinguishable because they all dealt with denial of discharge which, in many instances, specifically relates to what a debtor did or did not disclose on the schedules and SOFA. In *In re Thomas*, the debtor's discharge was denied due to myriad and significant omissions from the schedules and SOFA.[97] Among the allegations in *Thomas* was that the debtor did not list an income tax refund received within one year pre-petition.[98] In affirming the denial of the debtor's discharge the Eighth Circuit B.A.P. focused on the magnitude and number of omissions but made no mention of the income tax refund.[99] *In re Crumley* did not involve a debtor failing to list an income tax refund.[100] *In re Tran*[101] and *In re Groff*[102] were, like *In re Thomas*, decided based on a multitude of non-disclosures. In *In re Tran*, the court denied a debtor's discharge for failure to keep adequate financial records and satisfactorily explain loss of assets, mentioning, almost as an aside, that tax refunds were not listed on the debtor's SOFA.[103] In *In re Groff*, the court denied the debtor's discharge based on numérous omissions, only one of which was the failure to disclose

receipt of a tax refund.[104] Neither *Tran* nor *Groff* involved objections to exemptions or a debtor's state of mind months pre-petition.

The Cooks' discharge has already been denied. The only issue in this contested matter is whether their homestead exemption should be denied based on their state of mind five to six months pre-petition. There is no proof, extrinsic or otherwise, that the Cooks concealed their tax refund, or anything else, when they bought their home. The Cooks were represented by competent, experienced counsel when they filed their petition and their SOFA. Their failure to list their receipt of an income tax refund in November of 2011 on their SOFA filed in May of 2012 does not prove that they had the intent to hinder, delay or defraud a creditor when they bought their home.

*The Cooks' intent is supported by their testimony and the evidence*

 The reason courts undertake a "badges of fraud" analysis is because, as the Eleventh Circuit and other courts have recognized, typically the only way to prove intent is by circumstantial evidence.[105] Sometimes a debtor's testimony is fully supported by the direct and circumstantial

97. 431 B.R. 468 (8th Cir. BAP 2010).

98. The debtor also failed to report a loan in the amount of $150,000, $500,000 in settlement payments, $90,000 in income, and state tax refunds totaling $56,000; all of which he had received within two years pre-petition. *Id.* at 471.

99. *Id.* at 472. In *Thomas* the debtor not only failed to disclose these items, he also did not buy a home with them and then list his home so that anyone could question how he bought it, as did the Cooks here.

100. In *In re Crumley*, 428 B.R. 349, 360 (Bankr.N.D.Tex.2010) the creditor objected to the debtor's discharge for failing to disclose his true income in Question 2 of his SOFA. The court in dicta cited the Instructions to

Official Form B7 (which are not printed on the form) and noted that "[t]he inclusion of items such as income tax refunds and child support payments make it clear that—'income' for the purposes of Question 2 is intended to reach many distributions beyond the scope of gross income as defined by the Internal Revenue Code."

101. 297 B.R. 817 (Bankr.N.D.Fla.2003).

102. 216 B.R. 883 (Bankr.M.D.Fla.1998).

103. *In re Tran*, 297 B.R. at 821, 836.

104. *In re Groff*, 216 B.R. at 886–87.

105. *In re XYZ Options, Inc.*, 154 F.3d at 1271.

evidence; this is such a case. The Cooks have consistently and vehemently denied that their intent when they bought their home was to hinder, delay, or defraud anyone. The uncontested facts are that when the Cooks bought their home: 1) they were living in a mobile home, having sold their $5 million home; 2) they did not have a permanent home; and 3) they did not have cash or credit with which to buy a home. Mr. Cook's testimony was that when they bought their home he still believed he was going to get a big bonus from his car dealership as he had in the past and they could work things out with Centennial. Centennial could not shake that testimony. In answer to Centennial's questions about a vacant lot he and his wife tried to purchase in June of 2010, Mr. Cook testified:

> Q So, this says June 1st, 2010, you acquired this lot?
>
> A Yes.
>
> Q Why did you buy this lot?
>
> A To put a house on.
>
> Q Okay. And how were you going to put a house on the lot?
>
> A Well, I thought I was going to get a big bonus dividend through the business, and I had found a guy that would carry the lot, and I thought with the dividend, I could go put a house on it.[106]

As to when he and his wife purchased their current home, Mr. Cook testified:

> Q Now, this [the contract for purchase & sale] is dated January 3rd, 2011.
>
> A Yes.
>
> Q Is that approximately when you closed?
>
> A Yes.
>
> Q Now, when you closed at this point, did you still feel like you could pay the bank?
>
> A Yeah, business was picking up and everything was looking better, and I

thought sure everything would work itself out. I never had no intention of filing bankruptcy, that never entered my mind.

> Q Mr. Cook, why did you think, when you hadn't made payments and you were behind, why did you think you could still work this out with the bank?
>
> A It wouldn't take but one dividend payment. I originally was showed that I would make 700 plus thousand a year, I was not getting that. If I had got my dividend like I was supposed to, I'd have drew a dividend of 300 [thousand] plus dollars, that could have caught any behind payments and put me ahead.
>
> Q Is it your testimony that you believed in January of 2011, that you were going to receive a big dividend check?
>
> A Yes, sir.
>
> Q Of 300,000 dollars?
>
> A Yes, sir.
>
> Q Where'd it go, what happened to the money?
>
> A According to our accountants and bookkeepers for the dealership, we had to spend all that money in cash, in our cash money, net flow cash adding on to the dealership in order to keep our franchises for Chrysler and Hyundai, they made us redo two buildings totally to their standards.
>
> Q And what did that do to the cash flow—
>
> A It killed all the cash flow because we couldn't borrow any from the bank. At the time, the banks, because of the bankruptcy status that had went on with all the big companies and Chrysler, they were not loading [sic] any money to auto dealerships.

106. Doc. 193 at 33.

Q When did you realize that you weren't going to get the big 300,000 dollar distribution?

A It was probably later on, April, May [of 2011], something like that.

Q So, it was in the springtime [of 2011, after closing on the home] that you realized you weren't going to get the money

. . . .

Q After you purchased the home, Mr. Cook, did you continue to try and work with the bank to resolve?

A Yes, we still had meetings.[107]

Even in the face of Centennial's attempt to discredit him on cross examination, Mr. Cook remained adamant:

Q Okay. And you met with the bank principals in November, or December of 2010 about this debt?

A Yes.

Q And what was the substance of those discussions?

A Trying to work out something to see how we could work it out to make payments.

Q Okay, but you've also testified that Mr. Bond [Centennial's lawyer] told you he was going to foreclose your house on Lucas Lake?

A That's right.

Q Okay. Yet, you still remained optimistic, in January of 2011, when you bought a 4,000 square foot waterfront, golf course, gated community home, that you could pay off and work out this 2.3 or 3.1 million dollar debt?

A That's correct, I'd always been able to do it, so I didn't see why I couldn't now.

. . .

Q Okay. I believe your testimony was that after Centennial Bank filed the State Court action for a suit on a promissory note to collect the three million

dollar and change note, that you had some additional discussions with the bank?

A Yes.

Q When did those discussions take place?

A I'm not sure of the dates.

Q Okay. Who did you meet with?

A It was Mr. Tracy, Bill Bond, Dustin, Mr. Enfinger, and I believe yourself.

Q Okay. How did those discussions go?

A Mr. Bond said he wouldn't accept any deals, he wanted all the money.

Q Yet, you remained optimistic that you could repay the full amount of the debt because?

A I thought we could work it out with the President. Bill Bond is just the attorney, you know, he's got to see, but he don't call the final shots.

Q So, based on your discussions with Mr. Enfinger [a Centennial officer], who told you that he didn't like you and that he was going to do everything he could to ruin your financial condition, is that accurate?

A That's accurate.

Q Your testimony here today is that in January 2011, when you acquired an 800,000 dollar waterfront homestead, that you could work out this debt somehow?

A That's correct.[108]

Rather than proving an intent to hinder, delay, or defraud, the direct and circumstantial evidence presented before and after remand supports the Cooks' claim that they bought their home with the intent to have a permanent place to live. The Cooks were between the proverbial rock and a hard place: they had no permanent home and no cash with which to buy anoth-

---

**107.** Doc. 193 at 39–41.

**108.** *Id.* at 47–48; 50–51.

er; their temporary residence and all of their other valuable assets were pledged to secure a $3 million debt to Centennial; and Centennial had threatened to foreclose on the mobile home in which they were living.

On appeal, Centennial made much ado about the fact that the Cooks' home cost $800,000 and is in a gated, waterfront community. This is a red herring. First, as stated in this Court's original ruling, the fact that the Cooks bought an $800,000 home is not troubling in light of their prior financial successes, including that they used to live in a $5 million home. Secondly, although the Debtors' home cost $800,000 it is subject to a $650,000 mortgage that balloons in about 5 years.[109] The "bottom line" is that the value of the Cooks' home is essentially irrelevant. Even had the Cooks purchased a $10 million home free and clear of liens, the *most* this bankruptcy estate could possibly gain if the objections to exemption are sustained is $175,000.[110]

The absence of the tax refund in answer to question 2 of the SOFA is not evidence of the two badges of fraud the District Court requested this Court to review on remand: that the Cooks concealed the transfer of the tax refund or the refund itself. The Cooks' failure to list one bank account with a small balance on their bankruptcy schedules is not, under the facts of this case, egregious enough to make it relevant to their intent several months earlier. Mr. Cook's admission that he met with a lawyer in late January rather than May of 2011 does not prove, as Centennial argues, that the Cooks knew that their tax refund would be protected by buying a homestead. Even if that lawyer had been a bankruptcy lawyer, that meeting occurred *after* they had already spent the refund on the home.

In *In re Klinglesmith,* the bankruptcy court found the presence of some badges of fraud, yet still overruled the trustee's objection to the debtor's claim of homestead exemption.[111] In that case, the court found that while the debtor's inability to account for $356,250 in cash was somewhat troubling, the trustee had failed to establish that any of the debtor's financial decisions were aimed at hiding assets.[112] Centennial and the Trustee have similarly failed to establish that the Cooks' use of their tax refund was aimed at hiding assets. Although they argue that it was illogical for the Cooks to use the refund to buy a home unless they knew that the refund would then be protected as exempt homestead, the facts support the reverse. It is entirely logical for the Cooks to have purchased a home with their tax refund: they had no permanent home, they had no cash, they had no credit, and the bank could at any moment have foreclosed on the mobile home in which they were living.

## CONCLUSION

The Cooks are entitled to their homestead exemption. On the scales of justice, the circumstantial evidence of some "badges of fraud" on the left is outweighed by the facts and actual evidence of the Cooks' genuine intent to buy a permanent home on the right. The Trustee's and Centennial's objections to the Cooks' homestead exemption are, once again, overruled. An order overruling the objections to the Debtors' homestead exemption

---

**109.** The balloon date on the Cooks' purchase money note and mortgage is January 1, 2018. Centennial's Ex. 13.

**110.** The $155,000 used as a down payment on the home plus the $20,000 used for repairs.

**111.** *In re Klinglesmith,* No. 6:10–bk–00416–KSJ, 2011 WL 2471582, at *6–7 (Bankr. M.D.Fla. June 2, 2011).

**112.** *Id.*

896

will be entered consistent with this memorandum opinion.

DONE and ORDERED.